FILED

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JAN 15 2026

MITCHELL R. ELFERS
CLERK

---

Name and Prisoner Number/Alien Registration Number

---

Place of Confinement

---

Mailing Address

---

City, State, Zip Code

**(Failure to notify the Court of a change of address may result in dismissal of this action.)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANGYE GERALD AKARI
(Full Name of Petitioner) A# 22 1199069

Petitioner,

v.

George Dedos, Warden T.CDF
(Name of Warden, Jailor or authorized person
having custody of Petitioner) See attach list.

Respondent(s).

No. CV   **26cv72-DHU-DLM**
(To be supplied by the Clerk)

☐ AMENDED PETITION

### PETITION UNDER 28 U.S.C. § 2241 FOR A WRIT OF HABEAS CORPUS

1.  What are you challenging in this petition?
    ☒ Immigration detention
    ☐ Bureau of Prisons sentence calculation or loss of good-time credits
    ☐ Probation, parole or supervised release
    ☐ State Pre-trial detention
    ☐ Other (explain): _____
    _____

2.  (a) Name and location of the agency or court that made the decision you are challenging:
    Otero immigration courts 26 mc gregor Range Road NM Chappera 88081
    (b) Case or opinion number: A#0089 A# 22 1199069
    (c) Decision made by the agency or court: _____
    _____ See Exhibit "B page 2 p.1
    (d) Date of the decision: _____ July 8th 2025 _____

3.  Did you appeal the decision to a higher agency or court?    Yes ☒    No ☐
    If yes, answer the following:

Names of Respondents:
George Dedos, Warden of torrance County detaintion facility,
Kristi Noem, Secratary of D.HS, Pamela Bondi, USA Attony
General, Todd M. lyons, Acting Director of I CE.

(a) First appeal:
    (1) Name of the agency or court: _Board of Immigration Appeal._
    (2) Date you filed: _August 7th, 2025_
    (3) Opinion or case number: _A# 22 1199 069_
    (4) Result: _pending_
    (5) Date of result: _pending_
    (6) Issues raised: _See Exhibit "A" page two_
                _Attach coppy of brief to BIA_

**Attach, if available, a copy of any brief filed on your behalf and a copy of the decision.**

(b) Second appeal:
    (1) Name of the agency or court: _____
    (2) Date you filed: _____
    (3) Opinion or case number: _____
    (4) Result: _____
    (5) Date of result: _____
    (6) Issues raised: _____

**Attach, if available, a copy of any brief filed on your behalf and a copy of the decision.**

(c) Third appeal:
    (1) Name of the agency or court: _____
    (2) Date you filed: _____
    (3) Opinion or case number: _____
    (4) Result: _____
    (5) Date of result: _____
    (6) Issues raised: _____

_____

**Attach, if available, a copy of any brief filed on your behalf and a copy of the decision.**

4.    If you did not appeal this decision to a higher agency or court, explain why you did not:

_____
_____
_____
_____

5.    Other than the appeals listed above, have you filed any other petitions, applications or motions concerning the issues raised in this petition?        Yes ☒        No ☐
      If yes, answer the following:

(a)  Name of the Agency or court: *ICE Headquater (ERO Removal Division)*

(b)  Date you filed: *December 12th, 2025*

(c)  Opinion or case number: *A#22 1199069*

(d)  Result: *N/A*

(e)  Date of result: *N/A*

(f)  Issues raised: *See Exhibit "B"*

_____

**Attach, if available, a copy of any brief filed on your behalf and a copy of the decision.**

6.    For this petition, **state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States.** Attach additional pages if you have more than four grounds. State the facts supporting each ground.

CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) any available administrative or judicial remedies on each ground on which you requested action by the federal court.

GROUND ONE: *See attage page and Supporting facts:*

_____
_____
_____
_____

3

(a) Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim.):_____

*See Attache "C" Supporting A* (handwritten across lines)

(b) Did you exhaust all available administrative or judicial remedies relating to Ground One?

    Yes ☐          No ☐

(c) If yes, did you present the issue to:

    ☒      The Board of Immigration Appeals
    ☐      The Office of General Counsel
    ☒      The Parole Commission
    ☐      The State Court
    ☐      Other: _____

(d) If you did not exhaust all available remedies relating to Ground One, explain why:

_____
_____
_____
_____
_____
_____
_____

# GROUND ONE: 6

The issues presented here is whether, in the circumstance of this case and at this time, applying this mandetory detention regime violate my due process right clouse of the fiith amendment and Immigration and Nationality Act (INA).

(a)    ## Supporting FACTS:

I petitional Gerald Angye Akari currently detained since December 17, 2024 pursuant to "8 USC 1225 (b)(i)(B)(ii)" which provide that noncitizing found to have Credible fear of pesecution are Subject to mandetory detaintion pending consideration of ASylum application. If the officer detemined that at the time of interview that an alien has a Credible fear of Pesecution... the alien shall be detained for further Consideration of the application for ASylum.

I was interview by Custom and Boardes patrol the the Agency found me Credible fear of pesecution claim (Subject to the proclamation) "SB".

On January 3th, 2025, Department of home land security (DHS) issued a warrant for my arrest charging me as "you are alien present in the United State who has not been admited or paroled". My first Court I appear pro se on the January 13th, 2025. I was change to another IJ and scheduld a Bond hearing February 26th, 2025 that same morning ICE move me from Otero processing Center to Torronce County prison to a different IJ.

14 months in detaintion is Unreasonable without bond hearing. "Prolonged detaintion"

GROUND TWO: _____

_See attach page and Supporting facts._

(a) Supporting FACTS (Do not argue or cite law.  Just state the specific facts that support your claim.):_____

_See attach "6" Ground Two Supporting facts._

(b) Did you exhaust all available administrative or judicial remedies relating to Ground Two?

Yes ☒          No ☐

(c) If yes, did you present the issue to:

☒     The Board of Immigration Appeals
☐     The Office of General Counsel
☒     The Parole Commission
☐     The State Court
☐     Other: _____

(d) If you did not exhaust all available remedies relating to Ground Two, explain why:

_____

_____

5

6

GROUND TWO:
Whether I petitional Gerald Angye has a Due process Claim:

Supporting Facts:

Here I am Seeking to review that I have been detained for 14 months legality of my detention, arguing that the length of time I have been detained have violet my due process not challenging the decision to Commerce proceedings, the adjudication of my removal case, or an action to execute my removal order. I am Currently pursuing an Appeal with the Board of Immigration Appeal. my Sole relief I Seek is release from Castudy.

This Court should joined the majority of the Courts accross the Country in Concluding that an Unreasonable prolonged detaintion Under 8 USC 1225 (b) without Bond hearing. This Court should agree with those distric Courts that interprete Dhuiaisigion as Circumscribing an alien due process right to admision, rather than limiting that persons ability to challenge detaintion.

_____
_____
_____
_____
_____

GROUND THREE: _____
_____ _See attach_ _____
_____

(a) Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim.):_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_See attach to Three (Ground Three) Supporting facts._

(b) Did you exhaust all available administrative or judicial remedies relating to Ground Three?

Yes ☒    No ☐

(c) If yes, did you present the issue to:
- ☒ The Board of Immigration Appeals
- ☐ The Office of General Counsel
- ☒ The Parole Commission
- ☐ The State Court
- ☐ Other: _____

6

6

## GROUND THREE:

Whether I Gerald Angye petitional detaintion is prolonged in violation of due process.

Supporting Facts:

I offere, as a framework for analysing a due process tes used by some distric courts, that considered. (1) The total length of detaintion dote (2) The likely dueation of future detaintion (3) Condition of detaintion, (4) delay in the removal proceeding caused by the detainee, (5) delay in the removal proceeding caused by the govenment and (6) The likelyhood that the removal proceedings will result in a final order of removal or remand for further proceedings to an I.J.

Detaintion Since December 17th 2024 periot now exceeding 14 months is unreasonable prolonged: Ohat the specific delay in my asylum proceeding have been due entirely to the govenment and not atributed to me, the Continue detaintion is harmfull to my psychological health See exhibit "B", no medical treatment is available to me in this detaintion to address my health concerns and that i had also applied for humansteria parol to the I CE Headquater (ERO Removal Division) no responds from them.

Furthermore, the Appeal process before the Board of Immigration Appeal Combined with the petition for review process befor the United State Court of Appeal, is expected to be lengthy. I urge that these factors, considered together, indicated that my detaintion without a Bond hearing has become Unduly Prolonged.

(d) If you did not exhaust all available remedies relating to Ground Three, explain why:

_____

_____

_____

_____

_____

_____

_____

_____

GROUND FOUR: _____

_____

_____

_____

_____

(a) Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim.):_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(b) Did you exhaust all available administrative or judicial remedies relating to Ground Four?
    Yes ☐          No ☐

(c) If yes, did you present the issue to:
    ☐       The Board of Immigration Appeals

7

☐    The Office of General Counsel
☐    The Parole Commission
☐    The State Court
☐    Other: _____

(d)  If you did not exhaust all available remedies relating to Ground Four, explain why: ___

_____
_____
_____
_____
_____
_____
_____
_____


Please answer these additional questions about this petition:

7.  Are you challenging your conviction or sentence in any of the grounds raised above?

               Yes ☐        No ☒

(Claims challenging a federal conviction or sentence may only be raised in a motion under 28 U.S.C. § 2255, unless remedies under § 2255 are legally inadequate or ineffective.  Claims challenging a state conviction or sentence must be raised in a petition for writ of habeas corpus under 28 U.S.C. § 2254.)

    If yes, answer the following:

(a)  Have you filed -- a motion under 28 U.S.C. § 2255?    Yes ☐      No ☐
               -- a petition under 28 U.S.C. § 2254?    Yes ☐      No ☐
    If yes, answer the following:

(1)  Name of court: _____

(2)  Case number: _____

(3)  Opinion or case number:_____

(4)  Result:_____

(5)  Date of result:_____

(6)  Issues raised: _____
_____

**Attach, if available, a copy of any brief filed on your behalf and a copy of the decision.**

8

(b)  Explain why the remedy under § 2255 is inadequate or ineffective: _____

_____

_____

_____

_____

8.  If this petition concerns immigration detention or removal proceedings, answer the following:

(a)  Date you were taken into immigration custody: _December 17th, 2024._

(b)  Date of removal or reinstatement order: _July 8th, 2025._

(c)  Did you file an appeal with the Board of Immigration Appeals?   Yes ☒   No ☐

(1)  Date you filed: _August 7th, 2025,_

(2)  Case number: _# 22 11 99 069_

(3)  Result: _Pending_

(4)  Date of result: _pending_

(5)  Issues raised: _See Exhibit "A" page two_

_attach coppy of Appeal briefing to BIA_

Attach, if available, a copy of any brief filed on your behalf and a copy of the decision.

9.  If this petition concerns your confinement by the State of New Mexico, answer the following:

(a) Date you were arrested/detained: _____

(b) Charge(s) brought: _____

(c) Projected date of your trial: _____

(d) Are you represented by counsel?   Yes ☐   No ☐

(e) Have you raised your claims in the State Court?   Yes ☐   No ☐

(1) Name of Court: _____

(2) Date you filed: _____

(3) Case number: _____

9

# Question 10:

Petitioner ask the Court grand the following relief:

1. Grand writ of habeas Corpus and declearatory relief holding that my detention is prolonged unreasonable (unconstututional).

2. Order that respondant to release petitional immidiatly base on humaniterian or, altenatively, to provide petitional with a Bond hearing under "1226 (a)" within 5 business days of the Court order, at which the D.HS beas the burden to Justify my prolonged 14 months detention by showing by clear and convincing evidence, Materia change Circumstance rendaring petitional denger or flight risk.

3. Order respondatt to refraim from transfering petitional to any facility out of the district of New Mexico while writ of habea Corpus is pending

(4) Result: _____

(5) Date of result: _____

(6) Issues raised: _____
_____
_____

**Attach, if available, a copy of any brief filed on your behalf and a copy of the decision.**

10. Petitioner asks that the Court grant the following relief: _____ *See attach page*

_____ *See Attach page* _____

_____

or any other relief to which Petitioner may be entitled. (Money damages are not available in habeas corpus cases.)

I declare under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on *01-12-2026* _____ (month, day, year).

_____
**Signature of Petitioner**

_____          *01-12-2026* _____
Signature of attorney, if any                Date

10

GERALD ANGYE AKARI,

AH 22 M99069,

Torrance County Detention Facility,
209 County Road 7049,
Estancia, NM 87016.





ALBUQUERQUE NM 87102-2449

USPS TRACKING® #

9505 5118 0036 8014 1232 79

**LEGAL MAIL**

RECEIVED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JAN 15 2026

MITCHELL R. ELFERS
CLERK

To
Office of the Clerk,
US District Court of
333 Lomas Blvd,
Suite # 270,
Abq, 87102.

PRIORITY MAIL

US P

# EXHIBIT:

⇒ Exhibit: "A", Copy of Appeal briefing to the Board of Immigration Appeal.

⇒ Exhibit: "B", Copy of Humanitarian Outreach for migrant Emotional Health (H.O.m.E), Homemigration.org (mental Health assessment

⇒ Exhibit "C" Human Right Watch Deported Cameroonians Asylum Seekers Returned to U.S.A.

⇒ Exhibit "D" Sexual Abuse Screening Tool (TCDF)
⇒ Exhibit "E" Motion to proceed in Forma Pauperis.
Petitional Evidence in Support of my Petition Under 28 U.S.C §2241 for a writ of Habeas Corpus to release me from unreasonable prolonged detaintion base on Humaniterian claim. Or in the alternative a prompt Bond hearing Under "1226(a) within 3 business days of the Court Order.

Exhibit

"A"

**K. LARA BAHARLO, ESQ.**
California State Bar No. 243187
EOIR ID# AA020128
22287 Mulholland Hwy., #5850
Tel. (310)562-0975
Fax (310)919.3530
lara@larabaharlo.com

```
┌─────────────────────┐
│                     │
│     DETAINED        │
│                     │
└─────────────────────┘
```

**PRO BONO COUNSEL FOR RESPONDENT**

## UNITED STATES DEPARTMENT OF JUSTICE

## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

## BOARD OF IMMIGRATION APPEALS

## FALLS CHURCH, VIRGINIA

| | |
|---|---|
| ANGYE, GERALD AKARI )<br><br>Respondent, )<br><br>A# 221-199-069 )<br><br><br>DETAINED ) | **RESPONDENT'S BRIEF ON APPEAL** |

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... 1

I.    INTRODUCTION.................................................................................................. 2

II.   ISSUES PRESENTED........................................................................................... 2

III.  STANDARD OF REVIEW .................................................................................... 2

IV.   NEED FOR REVIEW BY A THREE-MEMBER PANEL ...................................... 2

V.    STATEMENT OF FACTS ..................................................................................... 3

VI.   ARGUMENT.......................................................................................................... 8

VII.  VIOLATIONS OF DUE PROCESS AND BIA PRECEDENT ............................. 20

VIII. ASYLUM ELIGIBILITY ..................................................................................... 22

IX.   WITHHOLDING OF REMOVAL ELIGIBILITY ................................................ 28

X.    CAT ELIGIBILITY .............................................................................................. 28

XI.   CONCLUSION ..................................................................................................... 30

APPEAL BRIEF-1                                        A221-199-069

## I.    INTRODUCTION

Respondent Gerald Akari Angye, presently in Department of Homeland Security detention, submits this brief on appeal, requesting that the Board of Immigration Appeals reverse the Immigration Judge's July 8, 2025 decision denying him asylum, withholding and withholding under CAT. For the reasons outlined in this brief, Mr. Angye urges that the Board reverse the IJ's decision or in the alternative remand proceedings in his case to the IJ.

## II.    ISSUES PRESENTED

1. Whether the IJ acted in clear error by mistaking an English language translation of a French document for the original and basing an adverse credibility determination on flaws in the translation that do not appear in the original.

2. Whether the IJ's analysis substituted speculation for evidence, relying on personal notions of how official documents *should* appear instead of evaluating the underlying foreign-language documents, testimony, and country-condition evidence.

3. Whether the IJ committed reversible legal error by misstating the record, thus failing to fully analyze the applicant's claim.

4. Whether the IJ misapplied INA §208(b)(1)(B)(ii) by imposing rigid corroboration requirements inconsistent with the statute's reasonableness framework and Board precedent.

5. Whether the IJ erred in discounting corroborating declarations as "general" and inconsistent with testimony.

6. Whether the IJ's categorical rejection of key documentary evidence violated due process and BIA precedent.

## III.    STANDARD OF REVIEW

Factual findings, including adverse credibility determinations, are reviewed for clear error. 8 C.F.R. 1003.1(d)(3)(i). Questions of law, discretion, and judgment and all other issues are reviewed de novo. 8 C.F.R. 1003.1(d)(3)(ii).

## IV.    NEED FOR REVIEW BY A THREE-MEMBER PANEL

Three-member review is appropriate in this case because the IJ's decision rests on clearly

APPEAL BRIEF-2                                    A221-199-069

erroneous factual determinations that infected credibility, nexus, and eligibility for relief. The decision is not in conformity with law or applicable precedent, as the IJ substituted speculation for record evidence, misstated material testimony and the timeline, imposed rigid corroboration contrary to INA § 208(b)(1)(B)(ii), *Matter of S-M-J-*, 21 I. & N. Dec. 722 (B.I.A. 1997) and *Matter of L-A-C-*, 26 I. & N. Dec. 516 (B.I.A. 2015). Panel review is necessary to correct clear error in the IJ's ruling, and issue guidance for the courts and parties.

## V.  STATEMENT OF FACTS

Respondent Gerald Akari Angye is a native and citizen of Cameroon. He was born in on November 29, 1990 in Northwest Cameroon. *See* Exh. A. Mr. Angye is a Chrisitan and a member of Cameroon's Anglophone minority. Exh. B. Mr. Angye was severely beaten and tortured by both Anglophone separatist fighters and Francophone Cameroonian government forces, by the former for imputed political opinion and by the latter for both his imputed political opinion and on account of his nationality and membership in the particular social group of Anglophone Cameroonians.

In 2018, Mr. Angye was employed as a teacher at Baptist High School in Greater Soppo, Buea and at the Inter Comprehensive High School in Greater Soppo, Buea where he taught International Accounting, Economics, Commerce and Financial Management. Id. Mr. Angye was a dedicated educator with a passion for research in his field of expertise, as well as for sharing his knowledge with his students and the next generation of social scientists. Mr. Angye is married with two children, the youngest of which was born in Cameroon while Mr. Angye was in immigration detention in New Mexico. Id.

As stated in Mr. Angye's Declaration, and in previously submitted country conditions reports, the ongoing Anglophone crisis in Cameroon has resulted in widespread insecurity and human rights abuses, especially for minorities in Cameroon's English-speaking region. Exh. B, Exh. M.

APPEAL BRIEF-3                                                    A221-199-069

On February 3, 2024, as Mr. Angye was on his way home from teaching, he was kidnapped by Anglophone separatist fighters as part of the ongoing conflict between French and English speakers in the northwest and southwest regions of Cameroon. He was accused of violating their directive that all schools be shut down and was further accused of betraying their struggle for independence. Exh. B. Upon his kidnapping, separatist fighters took Mr. Angye to an unknown location, blindfolded him, fired rounds of ammunition into the air and threatened to cut off his hand. Mr. Angye was beaten and tortured and given tools to dig his own grave in which he would be buried alive, because that is what, he was told, they did to "traitors." Id. After searching his bag, Mr. Angye's kidnappers found his phone and demanded a ransom of 500,000 Central African Francs ("FCFA"). Mr. Angye's kidnappers then called Mr. Angye's brother telling him he had 72 hours to pay the ransom, or Mr. Angye would be killed. Mr. Angye was held for six days and was eventually blindfolded and returned to town. See Exhs B, D, H.

On February 10, 2024 at approximately 3:30 a.m., a joint military police patrol broke into Mr. Angye's house and beat and tortured Mr. Angye in front of his wife and children. Exh. B, Exh. G. Cameroonian government military police accused Mr. Angye of supporting the separatists because his brother paid the ransom, and they told his wife that she would soon be a widow. Id. Cameroonian government military police then abducted Mr. Angye and kept him in an underground bunker with no light, food, water or toilet access. After two days in the bunker, Mr. Angye was given two bananas and a cup of water. Exh. B. He was not permitted to communicate with his family or with his lawyer. Id.

On February 14, 2024 the military police brought him out of the bunker to confirm his identity. They asked, "are you Angye, Gerald?" He responded "yes" (in English). One officer responded in French, calling Mr. Angye "Anglo fool" and told him that English-speaking Cameroonians had no place in the country. Exh. B. The Cameroonian military police brought pre-

APPEAL BRIEF-4                                                    A221-199-069

written documents to Mr. Angye which were all in French. Mr. Angye does not speak or understand French. Id. They ordered Mr. Angye to sign these documents, but he refused. Military police then beat Mr. Angye with a baton and a machete on the soles of his feet. They broke his kneecap on his right leg and tortured him all over his body. They attempted to drown Mr. Angye in a drum filled with chemical water and smashed his head against the ground and smashed his neck so that he could no longer breathe. They then tied a rope around his neck and strangled him until he passed out. Id. The next thing Mr. Angye remembers is waking up in a hospital emergency unit. A nurse explained to him that he was brought there to be placed in the mortuary because they believed Mr. Angye to be dead. Id. It was later explained to Mr. Angye that a Cameroon Development Corporations employee discovered an unidentified, presumably lifeless body in a banana plantation in Tiko. That "body" was Mr. Angye. He was transferred to the hospital's intensive care unit after four days. Exh.B, Exh.E.

On February 28, 2024, Mr. Angye was discharged from the hospital but was unable to return home and could not resume teaching. Separatist fighters as well as the Cameroonian government, military police, and gendarmerie all had access to Mr. Angye's personal information, and his movement across the country was being monitored. He no longer felt safe anywhere in Cameroon. In the meantime, Mr. Angye's family contacted a human rights lawyer in Cameroon to file a court case based on the persecution he suffered at the hands of the government. Id. Still fearing for his life, Mr. Angye escaped to Nigeria by boat on March 17, 2024. Life in Nigeria was very difficult for Mr. Angye. Without any friends or family, Mr. Angye slept on the streets and lived in constant fear. Id.

On April 1, 2024, Mr. Angye returned to Cameroon after his brother told him the lawyer they hired thought Mr. Angye had a chance at justice. Id. However, on April 27, 2024, Mr. Angye was arrested in Yaounde at a Gendarmerie identity card check point. As he was being transported

APPEAL BRIEF-5                                    A221-199-069

to the Kondengui Central Prison, the maximum-security prison in Yaounde, Cameroon, Mr. Angye jumped from the vehicle during a traffic jam and escaped. Exh.B. *See also* July 8, 2025 Tr. p. 91 at Exh. N.

On April 29, 2024, Mr. Angye's brother called to tell him that the human rights lawyer they hired advised that Mr. Angye leave the country immediately. The lawyer stated that the authorities were looking for Mr. Angye, and that under Cameroonian law, anyone who supports or offers any kind of help, including food or water, to separatist groups is considered a sponsor of secession. Exhs. B, D.

Fearing for his life, Mr. Angye again fled Cameroon to Nigeria and began his journey to the United States, eventually arriving in Mexico. Exh. B.

While in Mexico, Mr. Angye was extorted by corrupt police officers. In Chihuahua, Mr. Angye was kidnapped by criminals and held without the ability to communicate for five months. During that time, Mr. Angye was beaten and subjected to severe abuse and racism, being called "Black Negro" and "African monkey" and became the victim of human trafficking. After Mr. Angye's family paid a 50,000 pesos ransom, the kidnappers sold Mr. Angye to another group. Id., Exh. L. Mr. Angye was held hostage in Juarez, Mexico and was beaten often. Exh B.

Meanwhile, the Cameroonian government, police, military and gendarmerie as well as separatist fighters were all searching for Mr. Angye. An arrest warrant was given to his mother-in-law in Cameroon to give to him. This arrest warrant falsely accused Mr. Angye of collaborating with secessionists in the Anglophone region of Cameroon. Id., *see also* Exh. C.

On December 17, 2024, Mr. Angye arrived in the United States in Santa Theresa, New Mexico. He was apprehended and detained by U.S. authorities, and on January 3, 2025, Mr. Angye was issued a Notice to Appear in Immigration Court. Mr. Angye appeared pro se for the majority of his removal proceedings.

APPEAL BRIEF-6                                    A221-199-069

On July 8, 2028, Immigration Judge Ralph E. Girvin issued a decision denying Mr. Angye's applications for Asylum, Withholding of Removal and Withholding of Removal under the Convention Against Torture. An adverse credibility finding in that decision was based primarily on translations of an Arrest Warrant and a Wanted Notice issued in Cameroon for Mr. Angye. *See* I.J. at Exh. N, p.6. Mr. Angye is currently detained at the Torrance County Detention Facility in Estancia, New Mexico.

## VI.    ARGUMENT

### A.    THE IMMIGRATION JUDGE ACTED IN CLEAR ERROR BY BASING THE ADVERSE CREDIBILITY FINDING ON TRANSLATIONS OF DOCUMENTS RATHER THAN ORIGINALS.

One of the most glaring errors in the IJ's decision was in treating English-language translations of corroborating documents as if they were the originals. The IJ's adverse credibility finding rests heavily on supposed "fraud" in the English translation of an Arrest Warrant and Wanted Notice, which the IJ treated as if they were the originals. The documents were originally issued in French, and Mr. Angye submitted the French-language originals to the court. This finding was made in clear error and must be reversed. *See* I.J (July 8, 2025) at Exh. N.

### 1.    The IJ Treated English Translations of The Arrest Warrant and Wanted Notice As If They Were Originals.

The IJ states that "*The Court...will direct its attention to Exhibit 8...it is an arrest warrant in the English language,*" and says "*I believe that your entire case rests on Exhibit 8. Exhibit 8 is the supposed "Wanted" notice and arrest warrant that you provided to the Court. As I look at this I, see so many forms of fraud I cannot even count them. Everything is highlighted. There was even a little section where – you see the copy and paste mechanism from an Apple phone on the date...The stamps that are provided by your country are stamped on top of the cut and paste...The very bottom of the arrest warrant says, "Seen for nut, the manager."...The stamp again is on top of this cut and paste job. The fonts are different...*" *See* Tr. p. 97, (July 8, 2025)

These statements make it clear that the IJ believed Mr. Angye offered the translation as if it were the original document. The IJ then went on to find these documents non-credible because: (1) "every portion of this document looks like a cut and paste"; (2) "there are varying levels of font...

the verbiage in the translation makes little or no sense"; and (3) "the signature block is unintelligible and has more cut and paste along with... what appears to be a seal of the Republic of Cameroon, which appears to be superimposed." I.J (July 8, 2025) p.5 at Exh. N.

However, the document the IJ deemed incredible was not "an arrest warrant in the English language," but rather an informal English-language translation of the original French-language arrest warrant. This translation was produced by a pro se detained respondent, without access to legal or translation resources.

Mr. Angye was instructed at a January, 2025 hearing that any French-language documents would need to be translated into English for the Court. Tr., p.8 (Jan. 13, 2025) at Exh. O. Detained and without access to translation services, Mr. Angye asked a friend outside of detention to assist. That friend used Google Translate and pasted the translated text over the French original, resulting in the formatting issues the IJ identified. *See* Tr, pp. 54-55 (June 18, 2025); Tr, p. 99 (July 8, 2025) at Exh. O. While the translation was imperfect, the IJ's credibility determination improperly treated this translation as if Mr. Angye were presenting it as an original document instead of looking at the substance or authenticity of the original French-language documents, which were submitted unaltered and in full to the Record of Proceedings and did not exhibit any "cut-and-paste" characteristics. *See* Exh. C.

Based on the foregoing, the IJ's credibility analysis was fundamentally flawed. The French originals of both the Arrest Warrant and the Wanted Notice were properly submitted, and Mr. Angye's explanation for the English translation was reasonable under the circumstances. The IJ acted in clear error by treating an informally produced translation as if it were an original and making subjective visual assumptions to discredit it. Because the IJ failed to address the actual original Mr. Angye submitted to the court, the IJ's rejection of them was in plain error and warrants reversal.

**B.    THE IMMIGRATION JUDGE ACTED IN CLEAR ERROR BY REJECTING CORROBORATIVE DOCUMENTS BASED ON MERE SPECULATION AND UNINFORMED VISUAL IMPRESSIONS.**

**i. The Photograph in the Arrest Warrant and the Medical Records**

The IJ states that the photo of Mr. Angye in the Wanted Notice looked like he was "posing for some kind of particular event," rather than appearing in a "typical" wanted photo. *See* I.J (July 8, 2025) p. 6 at Exh. N. Speculation as to what a document *should* look like is not a permissible basis for rejecting evidence. In *Matter of O-M-O-*, 28 I&N Dec. 191 (BIA 2021), the Board recognizes that adverse credibility findings based on uninformed visual impressions or assumptions about document appearance may constitute clear error. The IJ's commentary on formatting and photos reflects precisely the kind of subjective conjecture the BIA has rejected and the IJ's approach violated well-established legal standards.

Furthermore, the IJ's reasoning fails under long-standing case law requiring that credibility determinations be based on specific, cogent reasons that bear a legitimate nexus to the finding. *See Wiransane v. Ashcroft*, 366 F.3d 889, 897 (10th Cir. 2004), *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). The stated issues with translation font, formatting, and photo style do not satisfy this standard, particularly where the underlying French-language originals were unchallenged.

The IJ further refers to the Medical Certificate at Exh. J, which he characterizes as:

"...*suspect as it does not specifically identify any specific harms that the Respondent claims to have suffered, other than a broken leg and wounds under foot, bleeding. It does not specify left foot, right foot, left foot – or...left leg, right leg or anything of the sort. It's mostly scribbled out on a document that actually comes from the Ministry of Finance.*" I.J (July 8, 2025), pp. 6-7 at Exh. N.

Here, the IJ again doubted the Medical Record's authenticity based on a speculative notion of how such a document *should* appear, an approach lacking any objective or expert foundation. Furthermore, contrary to the IJ's assessment, the document specifically named the harms Mr. Angye suffered, namely a "broken leg" and wounds and bleeding under his feet where he was beaten with a

APPEAL BRIEF-9                                    A221-199-069

machete. Exh. B, Exh. J.

In *Matter of O-M-O-*, 28 I&N Dec. 191 (BIA 2021) the Board indicated that while IJ's may assess document credibility, they may not base findings on uninformed visual impressions alone. Rather, such impressions may require forensic analysis or other expert testimony when "readily identifiable" indications of fraud are not present.

Under the BIA's "clear error" standard, findings based on uninformed conjecture are automatically suspect, and an adverse credibility determination must stand on "specific and cogent reasons", which is a threshold not met here. Here, the IJ's rejection of the Medical Certificate as a credible document lacked any objective or expert foundation, resting only upon the IJ's speculative notion of how that document *should* appear.

The IJ also failed to acknowledge the practical realities facing asylum seekers. Courts have repeatedly recognized that individuals fleeing persecution rarely have access to perfectly authenticated or professionally prepared documentation. See *Shu Han Liu v. Holder*, 718 F.3d 706, 712 (7th Cir. 2013) (rejecting the BIA's dismissal of an unauthenticated letter where the petitioner reasonably lacked access to government documentation); *Qiu Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013) ("How realistic is it to expect the petitioner to be able to obtain an authenticated copy of a communication from a local official that states an intention to violate Chinese national policy?"); *Chawla v. Holder*, 599 F.3d 998, 1005 (9th Cir. 2010) (rejecting rejection of evidence based on poor formatting).

Based on the foregoing, the IJ's credibility analysis was fundamentally flawed. The French originals of both the Arrest Warrant and the Wanted Notice were properly submitted, and Mr. Angye's explanation for the English translation was reasonable under the circumstances. The IJ erred by focusing on an informally produced translation and making subjective visual assumptions to discredit it. Because these documents directly support Mr. Angye's claims for protection, and no

APPEAL BRIEF-10                                    A221-199-069

valid reason was provided for discounting their corroborative value, the IJ's rejection of them was in plain error and warrants reversal.

Furthermore, the adverse credibility determination, based on the IJ's speculative document analysis, resting only upon the IJ's speculative notion of how certain documents *should* appear must be reversed under the BIA's "clear error" standard. If considered on remand, documents should be evaluated for authenticity using objective, expert-supported methods.

### C. THE IMMIGRATION JUDGE COMMITTED LEGAL ERROR BY MISSTATING THE RECORD AND ENGAGING IN A FLAWED MERITS ANALYSIS.

#### 1. Evidence of Past Harms

The IJ states that Mr. Angye said his injuries were "mostly bruises and bumps." IJ (July 8, 2025), p.4 at Exh. N. However, the record contains extensive descriptions of beatings with a baton and machete on the soles of his feet, a broken kneecap, attempted drowning in chemical water, strangulation to the point of unconsciousness, and repeated torture to the head, neck, and body.

The Board reviews factual findings, including credibility, for clear error. 8 C.F.R. § 1003.1(d)(3)(i). An adverse credibility finding must rest on specific, cogent reasons grounded in the record, not speculation or mischaracterization. *Elzour v. Ashcroft*, 378 F.3d 1143, 1153–54 (10th Cir. 2004); *see* INA § 208(b)(1)(B)(iii) (totality-of-the-circumstances). *See also Solomon v. Gonzales*, 454 F.3d 1160, 1163–64 (10th Cir. 2006); *Krastev v. INS*, 292 F.3d 1268, 1275 (10th Cir. 2002). Erroneously ignoring or misstating material evidence is reversible, and a judge may not mischaracterize evidence or fail to account for it. *See Karki v. Holder*, 715 F.3d 792, 800 (10th Cir. 2013). Questions of law and application of law to fact are reviewed de novo. 8 C.F.R. § 1003.1(d)(3)(ii). An IJ also must base findings on the record as a whole and provide reasoned application of the governing standards. *See, e.g., Solomon v. Gonzales*, 454 F.3d 1160, 1163–64 (10th Cir. 2006); *Krastev v. INS*, 292 F.3d 1268, 1275 (10th Cir. 2002).

APPEAL BRIEF-11                                                A221-199-069

The IJ reduced Respondent's harms to "mostly bruises or bumps," despite sworn testimony and a declaration describing severe, repeated torture (baton/machete blows to the soles of the feet, a broken kneecap, attempted drowning in chemical water, head-smashing, airway compression, and strangulation to unconsciousness). By misstating those facts, the IJ never engaged the legal questions the statute and regulations require. These legal errors are outcome-determinative. Properly characterizing the evidence triggers the past-persecution presumption (asylum), materially strengthens the more-likely-than-not showing (withholding), and squarely presents CAT.

2.    **The IJ's Misstatement of the Timeline of Events**

Incorrectly, the IJ states: *"Moreover, if taken together, the documents submitted by the Respondent's lawyer...state that on February 14th, the Respondent was taken into custody, was [sic] held by the French. He was later taken to the hospital and released on the 28th of February. According to the Respondent's testimony, the Respondent claims that he was blindfolded and released in town for 6 days. This, of course, contradicts the 14-day period that his lawyer has put forth."* I.J (July 8, 2025) p. 6. at Exh. N.

In contrast, Mr. Angye states: "On **February 3, 2024**, I was kidnapped by the separatist fighters while returning home from teaching...**For six days, I was held hostage. I was eventually blindfolded and retuned to town**...On **February 9, 2024,** I reported the incidents to the Buea central police station... [emphasis added]". Exh. B, p.2.

The Cameroonian lawyer states: "That on **February 3, 2024** he was kidnapped by separatist fighters due to the ongoing ANGLOPHONE CRISIS [sic] in the North West and South West Regions of Cameroon.... He was held hostage for about **6 days** and was eventually released blindfolded." Exh. D, ¶¶ 8-9 [emphasis added].

The IJ's allegation of contradictory dates between the two statements above is incorrect. The six-day period the IJ refers to in discrediting the lawyer's statements occurred not between February 14, 2024 and February 28, 2024, but between February 3, 2024 and February 9, 2024, dates that are referenced both in Mr. Angye's Declaration and testimony, as well as in his lawyer's declaration. Mr.

Angye's testimony and written statement are therefore corroborated by the letter submitted by his lawyer in Cameroon. The IJ's misstatement on the contradictory timeline amounts to clear error on credibility and should be disregarded.

### 3.    Flawed Protected Grounds Analysis

Asylum requires that a protected ground be "at least one central reason" for the harm. 8 U.S.C. § 1158(b)(1)(B)(i). Nexus may be proved with direct or circumstantial evidence of the persecutor's motive, and imputed political opinion qualifies as a protected ground. *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992); *Matter of S-P-*, 21 I&N Dec. 486, 489–90 (BIA 1996); *see also Karki v. Holder*, 715 F.3d 792, 801 (10th Cir. 2013) (recognizing mixed-motive analysis and political-opinion nexus). Here, The IJ stated there was "nothing in the record" establishing nexus and that Respondent "did not mention political opposition." I.J (July 8, 2025), p.11 at Ex. P. That is wrong as a matter of law and fact.

First, the IJ ignored clear evidence in the record that Mr. Angye's persecutors were motivated by political opinions they imputed to him. Mr. Angye explicitly testified, both in writing and at his hearing that Cameroonian government officials detained, brutally beat, tortured, and threatened him because they imputed to him support for Anglophone separatists. ( June 18, 2025 Tr. at 63; July 8, 2025 Tr. at 83-85 at Exh. O; Decl. p. 3-4 at Exh. B. ). The law requires the IJ to analyze imputed political opinion; treating the absence of formal party membership or explicit "opposition" language as dispositive misstates the legal test. *S-P-*, 21 I&N Dec. at 489–90.

Second, the IJ failed to conduct a mixed-motive analysis. Even if the record reflected multiple motives, the IJ was required to ask whether the perceived political support was one central reason for the mistreatment, using direct and circumstantial indicators (who the perpetrators were, the accusations made, the questions asked, the timing, and the pattern of abuse). *See* § 1158(b)(1)(B)(i); *Elias-Zacarias*, 502 U.S. at 483; *Karki*, 715 F.3d at 801. By declaring "no nexus"

and "no political opposition" in the face of testimony expressly describing government accusations of separatist support, the IJ skipped the required legal inquiry.

The IJ's legal error gutted the merits analysis. Properly applying the imputed political opinion and one-central-reason standards to Respondent's sworn account (detention and extreme torture by state officials because of his perceived separatist sympathies) compels, at minimum, a finding of nexus for asylum and materially strengthens the withholding and CAT claims.

### 4. The IJ's Statements on the Concept of Ransom

The IJ's statement "*When the Court considers the concept of ransom ... [it] does not comport with the definition of persecution*" adopts an incorrect categorical rule. IJ (July 8, 2025), p.10 at Ex. P. The INA asks why the harm occurred: a protected ground must be "at least one central reason" for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i). Motive may be mixed, and the agency must consider direct and circumstantial evidence of the persecutor's reasons. *Matter of S-P-*, 21 I&N Dec. 486, 489–90 (BIA 1996); *Karki v. Holder*, 715 F.3d 792, 801 (10th Cir. 2013). Financial gain therefore does not negate persecution where, as here, the record shows accusations that Mr. Angye supported Anglophone separatists and that he was detained and tortured by state actors on that imputed political opinion. *See also Woldemeskel v. INS*, 257 F.3d 1185, 1191 (10th Cir. 2001) (private acts can be persecution where the government is unwilling or unable to control them).

By declaring that "ransom" places the case outside "the definition of persecution," the IJ substituted a per se rule for the required nexus inquiry, ignored the mixed-motive doctrine, and failed to evaluate the evidence of imputed political opinion. That is legal error in the application of 8 U.S.C. §1158(b)(1)(B)(i) and clear error in the credibility/nexus findings. Correctly applying the law, the record supports that imputed political opinion was at least one central reason for the harms; at minimum, the Board should reverse and remand for a proper nexus analysis grounded in the evidence rather than a categorical "ransom = crime, not persecution" rationale.

APPEAL BRIEF-14                                         A221-199-069

Based on the foregoing, the Board should reverse for legal error, granting the applications for relief, or in the alternative remand with instructions to (i) accurately state the record; (ii) apply the 8 C.F.R. §1208.13(b)(1) presumption framework for asylum; (iii) conduct the 8 C.F.R §1208.16(b) withholding analysis; (iv) adjudicate CAT under §§1208.16(c), 1208.18; (v) evaluate nexus under imputed political opinion framework, (vi) apply the mixed-motive test using direct and circumstantial evidence, (v) reassess credibility under the INA § 208(b)(1)(B)(iii) totality test, and (vi) make reasoned findings tied to the record.

### D. THE IJ IMPROPERLY APPLIED THE LAW REGARDING CORROBORATION.

The IJ improperly applied the law regarding credibility determinations and corroboration to reject Mr. Angye's Asylum, Withholding of Removal and CAT claims, basing it upon alleged evidentiary gaps where none existed. The IJ's opinion states that declarations from Mr. Angye's wife and brother, along with medical records, the Wanted Notice and letters from his lawyer help support :

"...not the fact that respondent was persecuted, but more that the Respondent is not being truthful and has had his story put together by individuals who are not corroborating the Respondent's claims of harm. All of the statements contain generalities and do not comport with the testimony that the Respondent has provided today under oath.." I.J. (July 8, 2025), p. 8 at Exh. N.

The Respondent has a duty to produce evidence corroborating "the material elements of the claim where the evidence is reasonably obtainable." Matter of L-A-C, 26 I&N Dec. 516, 519 (BIA 2015), citing Matter of S-M-J, 21 I&N Dec. 722, 725 (BIA 1997); 8 U.S.C. §1158(b)(1)( B)(ii); 8 U.S.C. §1231(b)(3)(C). This duty requires production of material relating to both general country conditions and the specific facts upon which the claim is based. Matter of L-A-C, 26 I&N Dec. at 519-20. However, an IJ "must not place undue weight on the absence of a particular piece of corroborating evidence with overlooking other evidence in the record that corroborates the claim. Id. at 522. Furthermore, an IJ cannot hold a Respondent to inflexible authentication standards. E.g. Shu

APPEAL BRIEF-15                    A221-199-069

*Han Liu v. Holder*, 718 F.3d 706, 712 (7th Cir. 2013).

The IJ's denial of these claims fails to acknowledge or discuss the declarations, country conditions report, and other documents that corroborated Mr. Angye's claims and resolved the implausibilities the IJ based his denial on.

**E.      THE IMMIGRATION JUDGE ERRED IN DISCOUNTING ALL CORROBORATING DECLARATIONS AS "GENERAL" AND INCONSISTENT WITH TESTIMONY.**

The IJ improperly rejected Mr. Angye's corroborating declarations on the grounds that they "contain generalities and do not comport with the testimony that the Respondent has provided today under oath." I.J. (July 8, 2025), p. 8 at Exh. N. This broad dismissal lacks both legal and factual support.

First, the Immigration Judge failed to identify which statements were inconsistent with which portions of the Respondent's testimony, thereby denying the Respondent a meaningful opportunity to address or explain the alleged inconsistencies. The Board has long held that adverse credibility and evidentiary findings must be supported by "specific and cogent reasons." *Matter of A-S-*, 21 I&N Dec. 1106, 1109 (BIA 1998). A generalized rejection of all declarations, without specific analysis, is insufficient under this standard.

Second, the Immigration Judge failed to apply the proper totality-of-the-circumstances framework. *Matter of J-Y-C-*, 24 I&N Dec. 260, 263 (BIA 2007). The Respondent's declarations were submitted to corroborate material aspects of the asylum claim, not to replicate testimony verbatim. Minor differences in tone, level of detail, or phrasing are not grounds for rejection where the declarations are consistent on core facts, such as the Respondent's political affiliation, the nature of threats received, or the timeline of key events.

While the Board has acknowledged that declarations lacking specific detail may be discounted, *see Matter of L-A-C-*, 26 I&N Dec. 516, 518 (BIA 2015), it has also emphasized that

APPEAL BRIEF-16                                          A221-199-069

corroborating evidence should be evaluated in light of its intended purpose: to support, not replace, oral testimony. Moreover, it is entirely reasonable for declarants, particularly laypersons, friends, or distant relatives, not to possess first-hand knowledge of every detail of an applicant's experiences. Their accounts are nonetheless relevant and probative when they offer personal observations or attest to consistent facts within their knowledge. *Id.*

The IJ's categorical dismissal of all supporting statements as "general" and noncompliant with testimony reflects a misapplication of legal standards and a failure to consider the evidence fairly. Mr. Angye respectfully submits that the declarations were not only consistent with the core of the claim but also reinforced the credibility of the narrative. Accordingly, the IJ's rejection of this corroborating evidence should be reversed.

1.      **Corroborating Declarations Were Specific, First-Hand, and Consistent**

The record reflects multiple corroborating statements that are both specific and consistent with Mr. Angye's account. Here, Mr. Angye's wife submitted a detailed declaration describing the events surrounding Mr. Angye's kidnapping by separatists and his subsequent abduction and torture by Cameroonian government military police. This included her account of the 3:30 a.m. storming of their home by Cameroonian police, military officials and gendarmerie, where Mr. Angye was pulled from his bed, beaten, threatened and dragged away from his home in front of her and their one-year-old son. Exh. G. While she did not witness the torture that took place while Mr. Angye was subsequently detained by Cameroonian officials in an underground bunker, she provided a first-hand account of seeing Mr. Angye's condition at the hospital in Tiko, where she feared he would not survive the night. Id.

Similarly, Mr. Angye's brother submitted a declaration that corroborates the timeline and severity of Mr. Angye's injuries. Although he was not present for the beatings, he described efforts to stabilize Mr. Angye's health once hospitalized, all first-hand information that directly supports

APPEAL BRIEF-17                                    A221-199-069

Mr. Angye's testimony. Exh. H.

Moreover, the IJ failed to meaningfully address corroborating declarations from additional witnesses. Mr. Angye's landlady states that she witnessed screaming coming from Mr. Angye's apartment in the early morning hours of February 10, 2024 and a "police mixed patrol" announcing itself at the apartment that morning. She also states that since that morning, police patrols have repeatedly visited her property, asking for Mr. Angye's whereabouts. Exh. F.

The IJ also failed to address the declaration of Secretary General at the Tiko Rural Council, Pa Peter Fobon, who responded to a February 14, 2024 call to retrieve Mr. Angyes's presumably lifeless body from a banana plantation so it could be transported to the morgue. This declaration also corroborates the timeline and severity of Mr. Angye's injuries. Exh. E.

These declarations offer direct and eyewitness accounts that materially reinforce the Mr. Angye's claim and timeline of events. It is legally inappropriate for the IJ to cherry-pick from the evidentiary record or disregard consistent, detailed corroboration simply because not every witness observed the same moment. Each declarant testified to facts within their personal knowledge, as the law requires. *See Matter of S-M-J-*, 21 I&N Dec. 722, 726 (BIA 1997). *See also, e.g. Guzman-Vazquez v. Bar*, 959, F.3d 253,255 (6th Cir. 2020)(while failure to provide corroborating evidence may weight against credibility, "conversely, we have emphasized the irrelevance of testimony from individuals who lack such knowledge,"). Accordingly, the IJ's rejection of this corroborating evidence as "general" should be dismissed.

2.    **The IJ Erred by Giving Undue Weight To Purportedly Absent Corroboration.**

The IJ committed reversible error by giving undue weight to the purportedly deficient corroboration from Mr. Angye's wife, brother, and Cameroonian lawyer instead of "weigh[ing] all of the evidence provided and consider[ing] the totality of the circumstances in determining whether the applicant has met his burden." *Matter of L-A-C*, 26 I&N Dec at 522. Furthermore, the IJ failed to

APPEAL BRIEF-18                    A221-199-069

consider the letter from Pa Patrick Fobon, who found Mr. Angye's near-lifeless body dumped in a banana plantation, and the letter from Therese Achalefak, Mr. Angye's landlady who was present the morning of February 10, 2024 when Mr. Angye was abducted by Cameroonian military forces.

For all these reasons, the Board should reverse the IJ's corroboration findings as contrary to the law and record. They cannot be a basis for denying Mr. Angye relief.

## VIII.    THE IMMIGRATION JUDGE VIOLATED MR. ANGYE'S RIGHT TO DUE PROCESS AND BIA PRECEDENT

Noncitizens in removal proceedings are entitled to due process protections under the Fifth Amendment, including the right to a full and fair hearing. This encompasses the opportunity to present evidence, respond to the government's claims, and receive an impartial decision based on the full record. *See Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000); *Zolotukhin v. Gonzales*, 417 F.3d 1073, 1076 (9th Cir. 2005).

### A.    THE IJ'S FLAWED FOCUS ON TRANSLATIONS AND SPECULATIVE VISUAL IMPRESSIONS

The IJ dismissed critical evidence, namely the Arrest Warrant, Wanted Notice, and Health Certificate, not based on any finding that the original French-language documents were inauthentic, but rather because he treated informal English translations that Mr. Angye compiled while in an immigration detention facility as if they were being presented as original documents. The IJ disregarded Mr. Angye's explanation about his lack of access to certified translations and focused instead on the format and language of the translations, treating the translations as if they were originals and ignoring the originals. This misplaced scrutiny violated due process, particularly where the French-language originals were part of the record and unchallenged.

The IJ also rejected the Wanted Notice because the Respondent's photo appeared "striking" and unlike a "typical" wanted photo. I.J. (July 8, 2025), p. 6 at Exh. N. This reasoning rests entirely on the IJ's subjective speculation as to how official documents should look. Such conjecture is

APPEAL BRIEF-19                                    A221-199-069

explicitly prohibited by BIA and circuit precedent. *See Matter of O-M-O-*, 28 I&N Dec. 191 (BIA 2021). By excluding (or effectively nullifying) a central piece of corroboration on speculation, the IJ arbitrarily curtailed Respondent's right to present evidence in violations of Mr. Angye's due process rights. 8 U.S.C. § 1229a(b)(4)(B)

### B.    THE IJ'S MISSTATEMENT OF THE RECORD AND FLAWED LEGAL ANALYSIS

The IJ misstated the record, minimizing Mr. Angye's torture and misstating the timeline that Mr. Angye testified to and that his Cameroonian lawyer corroborated. By doing so, the IJ failed to apply the governing relief frameworks (e.g., past-persecution presumption for asylum; mixed-motive/nexus; CAT likelihood with official involvement). The IJ's error further undermines the credibility finding and reflects a failure to review the record accurately, further amounting to reversible legal error and denial of Mr. Angye's right to a full and fair hearing.

### C.    ARBITRARY REJECTION OF SUPPORTING DECLARATIONS

The IJ further denied Mr. Angye a fair hearing by ignoring or improperly discounting multiple corroborating declarations including (1) a statement from Mr. Angye's wife describing his condition in the hospital; (2) his brother's declaration corroborating the timeline of events and efforts to stabilize Mr. Angye's health; (3) a statement from the rural council member who found Mr. Angye's critically injured body in a banana plantation; and (4) a declaration from Mr. Angye's landlady who witnessed government forces at Mr. Angye's home on the morning he was abducted. By disregarding this consistent and material evidence without analysis, the IJ failed to assess the record as a whole. *See Zolotukhin*, 417 F.3d at 1076. Accordingly, the IJ's decision should be reversed, or in the alternative remanded, for a full and fair evaluation of the record.

### IX.    MR. ANGYE IS ELIGIBLE FOR ASYLUM

Asylum is available for individuals who meet the statutory definition of a "refugee." Mr.

APPEAL BRIEF-20                                                        A221-199-069

Angye is a refugee and should receive asylum in the United States. Refugee is defined in relevant part as : "Any person who is outside any country of such person's nationality...and who is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." See INA §1101(a)(42). As evidenced by his declaration and supporting evidence, Mr. Angye meets each element of this definition.

## A. MR. ANGYE IS UNABLE TO RETURN TO CAMEROON BECAUSE HE SUFFERED PAST PERSECUTION AND HAS A WELL-FOUNDED FEAR OF FUTURE PERSECUTION.

Mr. Angye cannot return to Cameroon for fear of torture and death. His fears are based on the severe past persecution he has already endured. Mr. Angye was the victim of detention, beating, torture, deprivation of food and water, forced submersion and near drowning in chemical water, and threat of prosecution and imprisonment at the hands of both separatist fighters and Cameroonian government officials. The basis for this persecution was Mr. Angye's membership in a particular social group, the Anglophone minority in Cameroon, and his wrongly imputed political opinion as a supporter of the Anglophone separatist movement. See Exh. B, Exh. C. Based on the foregoing, Mr. Angye fears that if he returns to Cameroon, he will be persecuted, tortured and killed by Cameroonian government officials.

## B. MR. ANGYE SUFFERED PAST PERSECUTION AT THE HANDS OF THE CAMEROONIAN GOVERNMENT ON ACCOUNT OF POLITICAL OPINION AND MEMBERSHIP IN A PARTICULAR SOCIAL GROUP.

To establish past persecution, an applicant must demonstrate that he was persecuted, and that this persecution was "on account of" a protected ground. 8 C.F.R. § 1208.13(b).

### 1. Mr. Angye's persecution was on account of imputed political opinion.

If the protected ground in seeking asylum is political opinion, the respondent must identify the opinion asserted, that the opinion constitutes a "political opinion," and that the political opinion

APPEAL BRIEF-21                                    A221-199-069

was "at least one central reason for the persecution." *Rivera-Barrientos*, 666 F.3d at 641 (internal quotations omitted). The BIA has defined political opinion as follows: "The particular belief or characteristic a persecutor seeks to overcome in an individual is his political opinion. Thus [it] refers not to the ultimate political end that may be served by persecution, but to the belief held by an individual that causes him to be the object of persecution." *Matter of Acosta*, 19 I.& N. at 234. The Tenth Circuit has acknowledged that "it may generally be true, as some circuits have held, that imputed political opinion is still a valid basis for relief after Elias–Zacarias." *Ustyan v. Ashcroft*, 367 F.3d. 1215, 1218 (10th Cir. 2004) (internal quotation omitted).

Here, Mr. Angye was detained, brutally beaten, tortured, and threatened first, by separatist fighters for allegedly violating their dictates, and then by Cameroonian government officials who wrongly accused him of supporting Anglophone separatists. On February 3, 2024, Mr. Angye was kidnapped by separatist fighters for allegedly violating their school-closure directives. Exh. B, p.2. After being held for six days, Mr. Angye was released by that group after his brother paid a ransom of 500,000 FCFA. Id. On February 9, 2024, after being released by separatists, Mr. Angye went to the central police station in Buea to report the incident. Id. p.3. On February 10, 2024, armed military-police officers broke into Mr. Angye's home at 3:30 a.m., beat and tortured him in front of his wife and children, and accused him of sponsoring separatists simply because his family had paid ransom to secure his release. They also threatened Mr. Angye's wife, telling her that she would soon be a widow. Id. These officers then abducted Mr. Angye and took him to a military barracks in Buea where he was imprisoned in an underground bunker without food, light, or access to water or toilets. He was deprived of contact with his family. Officers there told him that there was no place for English speakers in the country of Cameroon. Id.

On February 14, 2024, Mr. Angye was brought of the bunker to have his identity confirmed. When he answered the officer's questions in English, he was called *"Anglo fool."* Id. Officers

APPEAL BRIEF-22                                          A221-199-069

demanded that Mr. Angye sign pre-written documents in French, a language he does not understand, illustrating the government's attempt to falsely incriminate him based on ethnicity, language, and perceived political alignment. Mr. Angye refused to sign and officers then took photographs of Mr. Angye. Id.

Furious with his English response and refusal to sign the French-language documents, the officers intensified their physical abuse, forcing him to climb into a large drum of chemical water in an attempt to drown him, kicking him while wearing military boots, and smashing and breaking his kneecap. Id. He was told that this would be his last day on earth. Id. The military officers then smashed Mr. Angye's head and neck against the ground and tied a rope around his neck pulling it until he could no longer breathe, strangling him until he lost consciousness. Id. Mr. Angye awoke later in a hospital, where he was informed by a nurse and Mr. Fa Patrick Fobon, a rural council worker, that his nearly lifeless body had been found dumped in a banana plantation and was presumed dead. Mr. Angye required emergency medical care and intensive treatment before being discharged on February 28, 2024. Id. p.4, *see also* Declaration of Fa Patrick Fobon, Secretary General of the Tiko Rural Council at Exh. E.

This treatment, including arbitrary arrest, ethnic slurs, denial of medical care, and prolonged, life-threatening torture, was directly tied to the government's perception that Mr. Angye had aided separatist groups, despite his clear denial of any involvement. The language-based discrimination, attempted forced confessions in a non-native language, and systematic physical abuse are hallmarks of persecution under U.S. asylum law. *See Matter of S-P-*, 21 I. & N. Dec. 486 (BIA 1996), *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996). Mr. Angye's experience falls squarely within this framework.

**2. Mr. Angye was persecuted on account of his nationality.**

Mr, Angye was persecuted on account of his nationality because his persecutors targeted him

APPEAL BRIEF-23                                    A221-199-069

as an Anglophone, a protected linguistic group. The UNHCR Handbook states that "nationality" in the refugee definition "is not to be understood only as 'citizenship'" but also includes "membership of an ethnic or linguistic group." UNHCR Handbook ¶ 74. USCIS's RAIO training likewise instructs that "nationality" is a broad concept encompassing ethnic and linguistic groups. USCIS RAIO, Nexus (Jan. 30, 2025) at 23.

Here, government officials explicitly targeted Mr. Angye for speaking English and being Anglophone, calling him "Anglo fool" and saying there is no place for English speakers, thus establishing nexus to the protected ground of nationality.

### 3. Mr. Angye suffered past persecution on account of his membership in a particular social group, "Cameroonian Anglophones."

To establish membership in a "particular social group," an asylum applicant must show that he is a member of a group of persons that share a common immutable characteristic that he either cannot change or should not be required to change because it is fundamental to his individual identity or conscience. *Matter of Acosta*, 19 I&N Dec. 211, 233-34 (BIA 1985); *see also Niang v. Gonzales*, 422 F.3d 1187, 1198-99 (10th Cir. 2005) (discussing and adopting *Acosta*'s definition on "particular social group"). The group must have particular and well-defined boundaries and a recognized level of social distinctiveness. *Matter of M–E–V–G–*, 26 I. & N. Dec. 227, 234-38, 240-43, 247 (B.I.A. 2014); *Rodas-Orellana v. Holder*, 780 F.3d 982, 990-91 (10th Cir. 2015). Social groups must be assessed on a case-by-case basis. *Matter of M–E–V–G–*, 26 I. & N. Dec. at 251 ("Social group determinations are made on a case-by-case-basis"). As to the third element of the particular social group test, social distinction, "[m]embers of the group may be visibly recognizable, but society can also consider persons to be a group without being able to identify the members by sight." *Matter of M–E–V–G–*, 26 I. & N. at 240. Instead, "socially distinct" means that a group is "recognized in the society in question as a discrete class of persons." *Id.* at 249. To establish "social

APPEAL BRIEF-24                                              A221-199-069

distinction" necessary to establish a particular social group, an asylum petitioner must present "evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group. Although the society in question need not be able to easily identify who is a member of the group, it must be commonly recognized that the shared characteristic is one that defines the group." Matter of W–G– R–, 26 I. & N. at 217. Mr. Angye is a member of a particular social group of Cameroonian "Anglophones." Cameroonian Anglophones have been recognized as a particular social group by the BIA. *Ndonyi v. Mukasey*, 541 F.3d 702, 709 (7th Cir. 2008). To be a Cameroonian Anglophone is manifestly immutable. It is not something an individual can change or should be required to change. Further, membership in that group is easily identifiable and verifiable, making it sufficiently particular and socially distinct.

At the hands of Cameroonian government officials, Mr. Angye was detained, beaten, submerged in a drum of chemical water an attempt to drown him, deprived of food and water, pursued, and threatened with detention in a maximum-security prison. This would not have happened to him if he had been part of the French-speaking majority. Cameroonian government officials communicated to Mr. Angye that this was happening to him because he was a Cameroonian Anglophone, falsely accusing him of supporting Anglophone separatists. *See* Exh. C.

4.    **Mr. Angye is unwilling to return to Cameroon and is unable to avail himself of the protections of the Cameroonian government.**

Internal relocation is presumed unreasonable when the claimed persecutor is a government. *Singh v. Mukasey*, 288 Fed. Appx. 420, 421 (9th Cir. 2008). The government cannot show that relocation within Cameroon would be a "reasonable" expectation under the circumstances. Because Mr. Angye's persecutors were Cameroon government officials, internal relocation to another region of Cameroon is presumed unreasonable.

APPEAL BRIEF-25                                            A221-199-069

**5.     Mr. Angye's past persecution demonstrates that he has a well-founded fear of future persecution.**

Mr. Angye's fear of future persecution can serve as an independent basis for asylum. A well-founded fear of future persecution must be based both on a genuine subjective fear of persecution and an objective fear demonstrated through "credible, direct, and specific evidence in the record." *Karki*, 715 F.3d at 801. Mr. Angye only needs to establish the objective situation is a "reasonable possibility" and not that persecution is more likely than not. *Uanreroro v. Gonzalez*, 443 F.3d 1197, 1202 (10th Cir. 2006) (*quoting INS v. Stevic*, 467 U.S. 407, 424–25, 104 S. Ct. 2489, 81 L.Ed.2d 321 (1984)). A "reasonable possibility" may be as small as a 10% chance of persecution. *INS v. Cardoza*, 480 U.S. 421, 440 (1987). Mr. Angye's subjective fear is demonstrated in his Declaration. Mr. Angye's objective fear of future persecution can also be established through evidence that individuals like Mr. Angye face persecution as a "pattern or practice," even if he had never been singled out for harm. 8 C.F.R. § 208.13(b)(2)(iii)(A)-(B); *see also Woldemeskel v. I.N.S.*, 257 F.3d 1185, 1191 (10 Cir. 2001). To succeed on "pattern or practice" evidence, Mr. Angye must demonstrate he is a member of a particular social group or holds a political opinion that is targeted for "systemic or pervasive persecution." Id. at 1191. Mr. Angye has provided ample evidence that Cameroonian Anglophones and those suspected of membership in the separatist movement in Cameroon face systemic and pervasive persecution by the Cameroonian government.

The persecution and torture experienced by Mr. Angye will more like than not be repeated if he were returned to Cameroon. Because Mr. Angye belongs to the Anglophone minority and because of his history of prior arrest and abuse in detention, he is very likely to be considered a political opponent of the government and is very likely to face arbitrary arrest, detention, torture, and even death in Cameroon should he return. Mr. Angye's removal from the United States and return to Cameroon would be the equivalent of condemning him to certain torture and/or death. *See* Exh. K.

APPEAL BRIEF-26                                          A221-199-069

**6.      Conditions in Cameroon have not fundamentally changed.**

The government cannot show that country conditions have changed since 2024 when Mr. Angye was first detained, beaten, submerged in chemicals, and deprived of food and water in Cameroon. Cameroon is a nation scarred by brutal and ongoing violence against its Anglophone minority. These conditions, which have raged for decades, do not change quickly. In Cameroon, violence remains the status quo and is reportedly increasing. Recent reports confirm that the Cameroonian government or its agents continue to commit arbitrary, unlawful, and extrajudicial killings of Anglophones accused of being separatists. *See* U.S. Department of State, 2023 Country Reports on Human Rights Practices: Cameroon (2023) at Exh. M.

The IJ's findings on asylum should be reversed. In the alternative, Mr. Angye is entitled to a new hearing on his asylum claim where the IJ considers the evidence of record.

## X.      MR. ANGYE IS ENTITLED TO WITHHOLDING OF REMOVAL

The Attorney General "may not" remove an alien when he demonstrates that it is more likely than not his life or freedom would be threatened "because of the alien's race, religion, nationality, membership in a particular social group or political opinion." INA § 241(b)(3)(A). Mr. Angye has shown that he is more likely than not to face detention, torture, and probably death if he is forced to return to Cameroon. This conclusion is supported by multiple pieces of evidence, including (1) Mr. Angye's detention, beatings, withholding of food and water, and threats against his life when he was in Cameroon; (2) government officials going to Mr. Angye's home to find out his location; (3) the fact that government officials have Mr. Angye's picture; and (4) evidence that Anglophones and imputed members of the separatist movement are the targets of violence that are widespread and extensive in Cameroon. *See* Exhs. B-O. The IJ's findings on withholding should be reversed. In the alternative, Mr. Angye is entitled to a new hearing on his withholding claim where the IJ considers

APPEAL BRIEF-27                                                    A221-199-069

the evidence of record.

## XI.   MR. ANGYE IS ENTITLED TO PROTECTION UNDER THE CONVENTION AGAINST TORTURE.

Mr. Angye is entitled to protection under the Convention Against Torture ("CAT"). The United States is a party to CAT, an international convention that forbids the return of "a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *See* Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, Senate Treaty Doc. No. 100–20, p. 20, 1465 U.N.T.S. 85, Art. 3(1). Courts have interpreted federal regulations to require a person invoking CAT to demonstrate there is a "substantial risk" of torture. *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134 (7th Cir. 2015). The torture must be "by a public official, or at the instigation or with the acquiescence of such an official. *Karki*, 715 F.3d at 806. "[W]illful blindness suffices to prove acquiescence." *Id.* Even a single, isolated act may suffice to constitute torture. *See* 8 C.F.R. § 1208.18(a)(1). Furthermore, CAT "torture" is broadly defined as: "any act by which severe pain or suffering, whether physical or mental is intentionally inflicted on a person for such purposes as obtaining from him or a third person information for a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of, or with the consent or acquiescence for, a public official or other person acting in an official capacity." *Convention Against Torture*, Art. 1.

### A.   MR. ANGYE FACES A SUBSTANTIAL RISK OF TORTURE IF HE IS REMOVED TO CAMEROON.

Mr. Angye has shown he faces a substantial risk of torture if he is removed to Cameroon. In addition to the fact that the Cameroonian government has already tortured Mr. Angye by beating him, submerging him in a drum of chemical water an attempt to drown him, depriving him of food

APPEAL BRIEF-28                              A221-199-069

and water, and pursuing and threatening Mr. Angye with detention in a maximum-security prison, written documentation demonstrates the Cameroonian government's intent to further persecute and presumably torture Mr. Angye should he be delivered into their hands. *See* Exh. C, Exh. K. Willful blindness on the part of Cameroon officials is documented by Mr. Angye's own experience and the evidence of country conditions in Cameroon. The officials who tortured Mr. Angye were themselves government officials. An order requiring Mr. Angye to return to Cameroon is a death sentence. *See* Exhs. K, M. Cameroonian officials believe that Mr. Angye supports Anglophone separatists and again, have accused him of "collaboration with terrorists in the NW/SW" with a sentence of "10 years of imprisonment", requiring and ordering "all bailiffs, officers or agents of the judicial police to find him, arrest him and bring him to the central prison in Yaounde." *See* Exh. C. Government officials took Mr. Angye's picture when he was held in military barracks. *See* Exh. B. Mr. Angye was detained and tortured by government officials before he fled Cameroon.

For the U.S. government to deliver Mr. Angye into the hands of the government that has already tortured him and considers him a supporter of Cameroonian Anglophone separatists would render the United States complicit in his further persecution, torture and even death.

**B.    IN A CLAIM OF WITHHOLDING OF REMOVAL UNDER CAT, ALL POTENTIAL SOURCES OF TORTURE MUST BE CONSIDERED.**

In making a determination as to whether substantial grounds exist, or whether torture is more likely than not to occur, "all evidence must be considered, including, but not limited to: (i) Evidence of past torture inflicted upon the applicant; (ii) Evidence that the applicant could relocate to a part of the country where he or she is not likely to be tortured; (iii) Evidence of gross, flagrant or mass violations within the country of removal, where applicable, and (iv) Other relevant conditions in the country of removal." 8 C.F.R. §§208.16(c)(3), 1208.16(c)(3). *See Garcia v. Garland*, 73 F.4th 219, 232-34 (4th Cir. 2023); *Arevalo Quintero v. Garland*, 998 F.3d 612, 644-45 (4th Cir. 2021) [BIA

APPEAL BRIEF-29                                A221-199-069

reversed for failing to consider all the evidence in the aggregate].

As stated earlier, on July 8, 2025, the Immigration Judge issued a decision in Mr. Angye's case denying his applications for Asylum, Withholding of Removal and Withholding of Removal under CAT protections. In that decision, a final order of removal was issued for Mr. Angye. Denial was based primarily upon an erroneous adverse credibility finding by the IJ. The IJ's findings on CAT should be reversed. In the alternative, Mr. Angye is entitled to a new hearing on his CAT claim where the IJ considers the evidence of record.

## XII.  CONCLUSION

Based on the foregoing, Mr. Angye through undersigned counsel, respectfully requests that the BIA enter an Order reversing the decision of the Immigration Judge and granting his applications for relief, or in the alternative remanding his case to an Immigration Judge for further proceedings.

Respectfully submitted,

K. LARA BAHARLO, ESQ.
Pro Bono Counsel for Respondent

Dated: September 29, 2025

APPEAL BRIEF-30                                    A221-199-069

**K. LARA BAHARLO, ESQ.**
California State Bar No. 243187
EOIR ID# AA020128
22287 Mulholland Hwy., #5850
Tel. (310)562-0975
Fax (310)919.3530
lara@larabaharlo.com

## CERTIFICATE OF SERVICE

I, K. Lara Baharlo, hereby certify that a true and correct copy of the foregoing Brief on Appeal was served on the Department of Homeland Security (DHS) by EOIR electronic system on September 29, 2025.

K. Lara Baharlo
Pro Bono Counsel for Respondent

**K. LARA BAHARLO, ESQ.**
California State Bar No. 243187
EOIR ID# AA020128
22287 Mulholland Hwy., #5850
Tel. (310)562-0975
Fax (310)919.3530
lara@larabaharlo.com

DETAINED

**PRO BONO COUNSEL FOR RESPONDENT**

### UNITED STATES DEPARTMENT OF JUSTICE

### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

### BOARD OF IMMIGRATION APPEALS

### FALLS CHURCH, VIRGINIA

ANGYE, GERALD AKARI                )
                                   )
     **Respondent,**               )
                                   )
A# 221-199-069                     )          DETAINED
                                   )
                                   )
                                   )
**DETAINED**                        )
                                   )
_____)

**RESPONDENT'S EVIDENCE IN SUPPORT OF HIS APPEAL TO REVERSE THE DECISION OF THE IMMIGRATION JUDGE, OR IN THE ALTERNATIVE REMAND FOR ADJUDICATION OF RESPONDENT'S FORM I-589 APPLICATION FOR ASYLUM, WITHHOLDING OF REMOVAL AND WITHHOLDING OF REMOVAL UNDER THE CONVENTION AGAINST TORTURE AS SUBMITTED DURING REMOVAL PROCEEDINGS.**

Respondent, Gerald Akari Angye, through undersigned counsel, hereby submits the following evidence in support of his appeal and his applications for relief.

A221-199-069

| | |
|---|---|
| **Exh. A** | Form I-589 Application for Asylum, Withholding of Removal and Withholding of Removal Under the Convention Against Torture |
| | Identity Documents for Respondent, Mr. Angye |
| **Exh. B** | Declaration of Respondent, Gerald Akari Angye |
| **Exh. C** | Copies of Original French-Language Arrest Warrant and Wanted Notice and English-Language Translations |
| **Exh. D** | Declaration of Melvis Muaka, Mr. Angye's Attorney in Cameroon |
| **Exh. E** | Declaration of Pa Fobon Patrick, Secretary General of the Tiko Rural Council, dated May 9, 2025 |
| **Exh. F** | Declaration of Achalefack Therese, Mr. Angye's Landlady in Cameroon |
| **Exh. G** | Declaration of Atealah Prudencia Ngwingnteh, Mr. Angye's Wife |
| **Exh. H** | Declaration of Zama Sylvanus, Mr. Angye's Brother |
| **Exh. I** | Declaration of Angye Festus, father of Respondent Gerald Akari Angye |
| **Exh. J** | Republic of Cameroon Medical Certificate, Dated February 28, 2024 |
| **Exh. K** | Declaration of Mbah Regan Teboh, Anglophone Cameroonian asylum seeker and fellow Detainee at Torrance County Detention Facility evidencing ICE confidentiality breaches that have led to the re-persecution of asylum seekers upon removal and return to Cameroon. |
| **Exh. L** | Receipts for ransom payments wired from Mr. Angye's brother in Cameroon to Mexico. |
| **Exh. M** | Country conditions reports evidencing the dire human rights situation in Cameroon, and that Mr. Angye will be persecuted and tortured by Cameroonian authorities upon removal to Cameroon as an asylum seeker in the United States. |

1. U.S. Department of State, *2023 Country Reports on Human Rights Practices: Cameroon.* https://www.state.gov/reports/2023-country-reports-on- human-rights-practices/cameroon/

2. Human Rights Watch, *World Report 2023: Cameroon* (2023), https://www.hrw.org/world-report/2023/country-chapters/cameroon

3. Cameroon – Global Centre for the Responsibility to Protect, *Cameroon* https://www.globalr2p.org/countries/cameroon/

A221-199-069

4. **Human Rights Watch**, *Cameroon: Boko Haram Attacks Escalate in Far North* (Apr. 5, 2021), https://www.hrw.org/news/2021/04/05/cameroon-boko-haram-attacks-escalate-far-north

5. Lauryn Pfrommer-Pease, **Cameroon Country Conditions** (New Mexico Immigrant Law Ctr., Apr. 2025) (in file of Respondent).

**Exh. N**      **Oral Decision of Immigration Judge Ralph E. Girvin, Dated July 8, 2025**

**Exh. O**      **Hearing Transcripts**
- January 13, 2025    (Before IJ Jessica K. Miles)
- January 22, 2025    (Before IJ Samuel G. Williams)
- February 5, 2025    (Before IJ Samuel J. Williams)
- March 12, 2025      (Before IJ Ralph E. Girvin)
- March 27, 2025      (Before IJ Ralph E. Girvin)
- June 18, 2025       (Before IJ Ralph E. Girvin)
- July 8, 2025        (Before IJ Ralph E. Girvin)

A221-199-069

Exhibit

""

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

1

## MENTAL HEALTH ASSESSMENT

**Client**: Mr. Gerald Akari Angye
**Date of Birth**: 11/29/1990
**Date of Report**: 7/1/25
**Evaluator**: Meghan Colpas, Psy.D.

### Assessment Summary

1. I assessed Mr. Angye's mental health history and current emotional status at the request of Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.) and his attorney at Innovation Law Lab. The purpose of the assessment was to assess the psychological impact of Mr. Angye's experiences in his home country of Cameroon. He agreed to proceed with a mental health evaluation to assess for psychological symptoms, trauma history, and current functioning.

2. Mr. Angye reported a complex, severe trauma history that included kidnapping, physical assault, and torture in his country of origin. He described multiple kidnappings, being beaten to the point of near death, and torture by military officials and armed separatist militants as inflicted due to his ethnic identity as an Anglophone Cameroonian and his particular social group as an educator. He additionally was a victim of human trafficking in Mexico. Mr. Angye's reported symptoms were consistent throughout the interview and across the above standardized measures, resulting in the following diagnoses (APA, 2022):
   a. **Posttraumatic stress disorder (PTSD) (F43.10)**
   b. **Major depressive disorder, recurrent episode, moderate (F33.1)**

3. Continued detention will have an adverse effect on Mr. Angye's mental health for the following reasons:
   i. The detention environment serves as a trigger for Mr. Angye 's PTSD symptoms.
   ii. Treatment protocols for PTSD require a calm, stable environment in which the client feels safe (Saadi et al, 2020)
   iii. Detention exacerbates mental health conditions (Verhülsdonk, Shahab, & Molendijk, 2021).

4. Removal to his country of origin would have an adverse effect on Mr. Angye's mental health for the following reasons:

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

2

    i.    Return to the country where he was kidnapped and tortured would preclude his ability to develop a sense of safety.

    ii.    Proximity to daily reminders of his risk would trigger Mr. Angye's PTSD symptoms, as well as worsen his current depressive symptoms.

    iii.    Mr. Angye does not believe he would be able to attain adequate mental health care in his country of origin.

## Clinical Process

I met with Mr. Angye remotely on 7/1/25 for a total of two and a half hours via a secure video platform provided by Torrance County Processing Center. Mr. Angye spoke English and no interpreter was needed. The assessment was conducted through the following methods:

    a.    The clinical interview totaled two hours in duration.

    b.    Behavioral observations as detailed below.

    c.    Standardized assessment scales, including:

        i.    PTSD Checklist for DSM-5 (PCL-5)

## Credentials of Evaluator

I am licensed as a clinical psychologist in New Mexico. I received my doctorate in clinical psychology from the University of Denver and I completed my pre-doctoral internship at the University of New Mexico Health Sciences Center School of Medicine and my postdoctoral fellowship at the University of New Mexico Hospital. I have extensive experience in diagnosis, psychological assessment, trauma treatment, and intercultural practice. My experience with trauma includes work with survivors of torture, female genitial cutting, violent crime, intimate partner violence, and war. I currently work as a clinical psychologist at the University of New Mexico Hospital, and I have conducted both therapeutic treatment and comprehensive assessments for survivors of torture and severe trauma who are seeking asylum or in process for other types of humanitarian immigration. My reports have been admitted as evidence and I have testified as a mental health expert in immigration court.

## Client History and Behavioral Observations

Descriptions of Mr. Angye's background and trauma history are based solely on information he disclosed during the clinical interview. His recall of events was logical and he often could recall specific details, such as names of other individuals being held in captivity with him. This report includes clinical behavioral observations at the points they occurred in the interview process.

1.    As part of this evaluation, I questioned Mr. Angye about his personal history, with particular attention to traumatic experiences that could influence his current psychological condition. Mr. Angye is a 35-year old male, who was born in Cameroon and raised in a small village. He appears to be of average height and average weight. Mr. Angye's self-presentation was anxious throughout the interview, with a few

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

3

exceptions of tearfulness and crying when talking about his family. His facial expressions were appropriate and he spoke calmly, with some pressured speech when recalling traumatic events. Mr. Angye readily shared his history and symptoms and appeared to put forth significant effort. He described his experiences in a linear and coherent manner. He also demonstrated several of the torture techniques inflicted on him and showed the evaluator physical injuries as a result of the torture and beatings.

*Early Life*

2. Mr. Angye was raised by his biological parents and has two brothers and three sisters. He was the fourth child born and the youngest son. Mr. Angye and his family were Anglophone Cameroonian. His father was retired military, and then worked as a farmer. Mr. Angye explained that he had a large family growing up, and in the Cameroonian tradition, his father had another wife and his grandfather had four wives. He explained how having a large family used to be common to survive. Mr. Angye was raised Christian, and explained, "My grandfather was a clergyman, and the church was in his yard. So I like to say I was raised in the church." His father strongly encouraged education, and all of the children went to school. He recalled money was often tight, since his family relied on farming, and his father always emphasized going to school despite its added strain on the family's economic wellbeing. Mr. Angye remembers his childhood and his parents positively. He shared, "Even if my dad did not have shoes on his feet, he made sure we had some."

*Adulthood*

3. Mr. Angye moved to a larger town for secondary education and then lived with his grandmother, who took care of him. Mr. Angye completed high school and then moved to the northwest region to attend a private university. He lived by himself and worked as a housing agent, to support himself while attending university. Mr. Angye graduated with his Bachelor's degree in accounting, briefly worked as an auditor, and then became a commerce teacher. He taught economics, international accounting, and financial management at two different high schools for seven years. He reported that one of his brothers and one sister also became teachers, and education was a strong value in his family. Mr. Angye got married, and he and his wife had a son, now 3 years old. He and his wife also adopted his niece, now 5 years old, when one of his sisters was sexually assaulted and she did not want to keep the child. In 2022, Mr. Angye began a master's degree program in mathematics economics.

*First Incident of Kidnapping and Torture*

4. Beginning around 2017, Mr. Angye described that armed separatists militants began targeting schools and educators in Anglophone Cameroon. He recalled there being fear

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

4

about teaching and worrying about the safety of himself and his students, and they occasionally had to teach on weekends or evenings to draw less attention. Mr. Angye denied any political participation in protests, noting he only wanted to do his job and teach his students. He began teaching less often, and described his town like a "ghost town," noting that people were becoming too fearful to go out. Around February 2024, Mr. Angye was teaching an evening class on a Saturday. He was looking for a taxi to head home when two men with guns appeared behind him and told him to get on a motorbike. They told Mr. Angye that the separatist General wanted to see him. He tried resisting, asking "what for?" and the men shot their guns into the air. They blindfolded him and forced him onto the motorbike. Mr. Angye estimated they traveled for about an hour, and then brought him into a military base. Mr. Angye was confined to a room with other detainees, and described that there was a camera and two men with guns in the room. They took his shirt and his bag, with all his belongings. He recalled, "I was told the General wanted to see me to give me tea. I quickly realized that actually meant to beat me."

5. Mr. Angye was beaten and tortured by the armed men. He demonstrated with a chair how he was forced to lay under it, while one man lit matches on the bottom of his feet and another lit matches on his chest. With his burned feet, he was then forced to jump 100 times. Mr. Angye was returned to the cell and was given no food or water. The next day, he was brought to the general again, who showed him the chalk and economics textbook they found in his bag. He was told to join the separatist group and he refused. Mr. Angye explained, "They said I was violating that schools were shut down. They told me they would give me a choice: cut off my arm or bury me alive." Mr. Angye was pleading with them, and they told him they have been monitoring him for some time. He told them to bury him alive and was brought outside to dig his own grave. While digging, Mr. Angye pleaded with them not to do this. After one hour, the armed men asked him who they could call from his family. Mr. Angye remembers, "I give them my brother's number. They call and tell him I am a traitor and they will kill me." On the third day of captivity, he was finally given a small amount of rice to eat. At night, he remembered hearing gunshots all night and fearing for his life. On the sixth day, they told Mr. Angye that he was being released. He was blindfolded again and driven by motorbike, then dropped in a sandpit. He had no shoes. He was given his wallet and his books, but 7,400 francs were missing. His ID card was in there, but the Cameroonian flag had been cut off.

*Second Incident of Kidnapping and Torture*

6. Mr. Angye went home by taxi, and his wife encouraged him to report to the police. The next morning, he went to the police and informed them of the kidnapping, assaults, torture, and the damage done to his ID card. Mr. Angye had to get antibiotics, pain

on 10th Febr                                                                                    5

reliever, and malaria medication to recover. That night, around 10 pm, Mr. Angye was woken from sleep by a loud sound. Military officers pulled him from the bed, speaking in French, which he did not understand. His wife understood, and began begging them to leave. The officers said that Mr. Angye was supporting the separatists and they punched him and beat him with a military belt. His son and daughter were there and crying. The officers pushed his wife, and told her she would soon be a widow.

7. Mr. Angye was forcibly brought to a nearby underground military bunker. There were four other men in the bunker, and one who also spoke English told Mr. Angye that he was a military member and had refused to join the separatists. Mr. Angye was held in the bunker for two days, with no light or toilet. Once a day, the metal door would open and he was given two bananas. He remembers sitting on the cold floor in the dark. Mr. Angye paused at this point, and had to take a few deep breaths before moving on. He remembers the officers taking pictures of him, and telling him to sign documents in French, which he refused. He recalled seeing the police report he had filled out and his damaged ID. The officers slapped him and burned matches on his feet. Mr. Angye paused then to show the evaluator the scars on his feet. They beat him with their military boots and smashed his neck. He said, "I couldn't breathe. I was shouting, 'I can't breathe!' All the time, they were insulting me. They said an English speaking Cameroonian does not have space in Cameroon. This is what I think about a lot from the torture." The officers then forced Mr. Angye into the water. He described that there were chemicals in the water, and his body began to itch and burn. They tried to drown him, holding him underwater. He inadvertently swallowed some of the water while fighting to come up. He recalled there being four officers, and they whipped him with a rope and broke his right kneecap. He was then strangulated from a rope tied around his neck and lost consciousness.

*First Attempt at Fleeing Cameroon*

8. Mr. Angye woke in a hospital. Workers had reported a dead body left in a plantation, and when he was found to still be alive, he was transported to a hospital. A nurse told him that he was found with blood coming out of his ears and nose, covered in bruises, and with a swollen and disfigured kneecap. Mr. Angye showed the evaluator a dark scar on his neck from the strangulation. He could not speak or remember much right after, and instead wrote down his wife's number for the medical team. He remembered having diarrhea, which the medical team thought might have been from the chemicals he drank, and that he was given palm oil to drink to help. His wife was told that the medical team was not sure he would survive. Mr. Angye was in the hospital for two weeks. He said, "I was so scared. I knew now that the separatists and the military police were working together." His brother suggested calling a human rights lawyer, and the lawyer recommended that Mr. Angye and his family go into hiding. His wife and children went

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

6

to stay with a relative, and his brother gave Mr. Angye money to go to Nigeria. Mr. Angye had never been to Nigeria before, and when he arrived, he had to sleep on the street. He reflected, "I was a teacher, I was a mentor. I became a beggar. I only survived by people of good heart giving me bread."

*Third Incident of Detention*

9. His family decided he should try to sneak back into Cameroon, and for a while, he would sleep in his sister's salon and only see his children rarely and at night. Mr. Angye realized this was no life and began to explore other options. He decided to apply for another position elsewhere with his degree and was stopped in a taxi at a checkpoint. Mr. Angye described that when he gave the officers his ID with the flag removed, he was pulled to the side and told he would be taken to the maximum security prison for being a separatist. He was put in a car and on the way, there was an accident on the road leading to chaos and traffic. When the staff were distracted by the accident, Mr. Angye jumped from the car and ran into the crowded street. He ran until he reached his sister's salon.

*Second Attempt at Fleeing Cameroon*

10. Following this event, his lawyer informed him that he needed to leave the country because the officers would not stop looking for him. His wife was pregnant when he decided to leave. Mr. Angye took a night bus to Nigeria, disguised as a bus driver that he bribed so that he would not be stopped to provide ID at checkpoints. Mr. Angye spent another month in Nigeria, but there were many Cameroonians, and he was scared that information would get back to the officers and militants. His brother sent him money to get to South America. Mr. Angye then made his way to Brazil, and then Tapachula, Mexico by car, bus, and walking through Panama. Around August 2024, he met other migrants making their way to Mexico City and the U.S. border, and they were arranged to take a bus by an agent.

*First Incident of Human Trafficking*

11. While sleeping on the bus around Chihuahua, Mexico, Mr. Angye was awakened by the cartel stopping the bus. He reported that all foreigners were removed from the bus, beaten, and had their belongings taken. Mr. Angye described, "We were then taken to this ranch. There were probably around 90 migrants there. Women and children too. I was put on the side with the Africans. The other migrants told me they had been held for months." The cartel told Mr. Angye that they control Mexico and he would have to work for them.. Mr. Angye explained that he was then forced to work on digging for pipes, and given only one small water a day. Mr. Angye recalled that there were two men from Mauritania, and while they were digging, the cartel shot them in the back and they died. Mr. Angye became tearful while describing this, crying and burying his head in his

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

7

hands. He had to take some deep breaths before continuing. He shared, "They were running. Blood flowing everywhere. The cartel made sure we saw it, so we'd know they were serious."

*Second Incident of Human Trafficking*

12. On his 12th day of being held in labor trafficking, Mr. Angye was informed that he would be released. A 23 year old man from Peru, named Edward, was also set to be released, and they were both blindfolded and put in a car for around five hours with armed men. They arrived at another ranch and an armed man told them they were bought from the other cartel boss. Mr. Angye and the other immigrants were forced to clean the house, cook, and unload trucks at night under gunpoint. Mr Angye was kept there for around four months. He and the other victims of trafficking did not know where they were. Mr. Angye checked a pizza receipt and saw that they were in Juárez, Mexico. Edward, his friend from Peru, was being released, and Mr. Angye gave him his family's information and asked him to try to contact them once he was out. He recalled being beaten throughout the labor trafficking and experiencing worse treatment due to being African and Black. He was not able to shower and his skin was pale and flaking off. He slept curled up on the floor, and still has back pain from this. He did not see the sun as he was only let out of the room to work at night. He described that his hair and beard grew long, and he was only fed rice and a fried egg. Mr. Angye was released around December, along with a few other migrants, and dropped near the border fence in the mountains.

*Escape to the U.S.*

13. Mr. Angye reported running towards the U.S. and worrying he would be shot. He put his hands up to surrender to border police. Once in detention, Mr. Angye reported the labor trafficking, hoping the other migrants would be found and freed. He learned that his wife gave birth to his second son. While in detention, Mr. Angye described that he repeatedly requested access to a law library and was not provided this. He reported having to see a mental health doctor and being put in isolation, but he was not sure why. He described the food as "worse than dog food in Africa," and that one time, he had difficulty breathing for four hours, and no officer came by. Mr. Angye additionally described only being given a small bottle of water for the whole time and three or four days duration where they could not flush the toilet, and being locked in the room. He said he tried to cover the toilet with a bedsheet to control the smell. He reported experiencing racial discrimination in detention, noting that Africans are not given jobs, even cleaning, and he would like to have a way to stay busy and distracted. Mr. Angye expressed intense worry and guilt about the safety of his wife and children, as well as not being able to financially contribute. He reported immense guilt because his mother is having health problems, and the family cannot afford for her to get medical care, since they spent all their money

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

8

trying to rescue Mr. Angye from trafficking. He broke down and sobbed, "They spent everything on me. They saved my life. And now there is nothing left."

14. When asked about what will happen if he is returned to Cameroon, Mr. Angye explained that he is not safe in Cameroon related to his ethnic identity as an Anglophone Cameroonian and as a teacher. He shared, "If I go back, I will die. There is a warrant issued for me. My wife and my family cannot go into town, they are also not safe there and wanted."

15. Mr. Angye presented with anxious affect throughout the assessment, with moments of intense sadness reflecting the content. He was able to express the deep sadness at the traumatic events and missing his family through crying at several points in the interview, including needing to be coached to take a few deep breaths before being able to continue.

## Presenting Symptoms and Diagnosis

1. Mr. Angye reported having medical conditions of back pain and migraines, which began after being held in captivity and experiencing traumatic brain jury from torture. He recently fractured his wrist playing soccer. Mr. Angye presents with psychological symptoms of Posttraumatic Stress Disorder (PTSD). His symptoms also match criteria for Major Depressive Disorder, recurrent episode, moderate. His post-traumatic stress symptoms are not better explained by a physical health condition. He denied any current substance use. These symptoms are evident from his verbal report to me, from written assessment tools I administered, and from my observations. Diagnostic criteria can be found in the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM 5-TR) (APA, 2022).

2. To diagnose Posttraumatic Stress Disorder (PTSD), the first criterion is exposure to an event involving actual or threatened death, serious injury or sexual violence to self or others. Mr. Angye experienced several such events, including kidnapping, torture, physical assault, witnessing murder, and human trafficking. Currently, Mr. Angye fears for his life under the continuing possibility he could be returned to the hands of the Cameroonian government.

3. The second criterion for PTSD is that the traumatic event is persistently re-experienced through symptoms of intrusion. Intrusive symptoms Mr. Angye reported recurrent intrusive memories of trauma events, feelings of re-experience, nightmares, and insomnia. He described only being able to sleep four hours at a time and frequent nightmares of the torture.

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

9

4. The third diagnostic criterion for PTSD involves persistent avoidance of stimuli associated with the trauma, and the numbing of general responsiveness in relation to these stimuli. Mr. Angye described a persistent need to avoid any reminders of the trauma, as well as trying to avoid thinking about the trauma and staying distracted.

5. The fourth criterion for PTSD involves negative alterations in cognition or mood associated with traumatic stress. Mr. Angye reported emotional alterations that include strong negative thoughts about himself, other people, and the world, including guilt, shame, and blaming himself.

6. The fifth criterion for PTSD is a marked increase in reactivity. Mr. Angye reported hypervigilance and being easily startled, especially while in detention and worrying constantly about his safety.

7. As required for a PTSD diagnosis, Mr. Angye's symptoms have persisted for more than one month and result in both clinically significant distress and impaired functioning. Mr. Angye meets all criteria for posttraumatic stress disorder (PTSD), based on the clinical interview and confirmed through the PCL-5 assessment.

8. Many of the symptoms described above also indicate that Mr. Angye is suffering from a major depressive disorder (MDD), moderate, recurrent. This diagnosis is seen most clearly through the clinical interview and is also verified by observation. Relevant symptoms include depressed mood, insomnia, little interest or pleasure in doing things, fatigue, and difficulty concentrating. Mr. Angye denied any current suicidal ideation, though noted previous suicidal ideation. He described, "I would prefer to die here than be sent back to Cameroon and die there." These depressive symptoms cause clinical distress and impaired functioning, and they have persisted since Mr. Angye's trauma experiences.

## Current Perceived Dangers

As detailed above, Mr. Angye repeated his fear of returning to Cameroon multiple times throughout the interview. He described the threat of being killed if he is returned. Mr. Angye is in contact with his parents and his wife and children, who are in Cameroon, and are having to limit their activities and report ongoing threats to their safety.

## Detention as Trigger for Torture Memories

Mr. Angye's torture memories make his time in immigration detention difficult and detrimental to his emotional health. Many of his day to day encounters serve as triggers of his previous torture, and Mr. Angye is at severe risk for increased mental health concerns from continued detention.

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

10

### Potential Presentation at Hearing

1. It is likely that Mr. Angye's trauma symptoms and fear of deportation will impact his presentation in Immigration Court or during an official interview. He may become emotionally overwhelmed, and need a moment to take deep breaths before continuing. He also might present anxiously, with pressured speech, and need assistance with pausing for questions and clarity. Mr. Angye recalled an exceptional amount of detail, including names of others, smells, and dates, and he may feel pressure to include every detail. In the evaluation, he benefited from deep breaths and pausing before continuing.

2. During the evaluation, Mr. Angye's memory was exceptionally clear, and he could recall specific details including dates and names. He also particularly recalled sensory experiences, such as seeing blood, his rough peeling skin, feeling hot and not able to breathe, which is common with traumatic memories. Mr. Angye became emotionally overwhelmed at times and benefited from taking breaks to breathe. It is possible that when telling his trauma story in court, there could be potential trauma influences on his recall due to the high-stakes setting of a court hearing. Trauma memory is often disjointed and trauma memories tend to be sensory and emotional, rather than sequential or logical. A survivor is likely to recall specific elements of the experience in vivid detail and may retain clear "snapshot memories", or perhaps sensory memories available for recall if they are asked about images, sounds, or smells. Yet details that did not seem pertinent to survival, such as time sequences or the number of persons in a room, are rarely attended to during the event. Consequently, they are likely to be misremembered or unavailable for later recall. Examples of data that may be misremembered include the timing or time sequence of events or any details that were peripheral to immediate survival, sensory experience, or emotional impact. Trauma survivors are frequently anxious about their lack of ability to retrieve some memories, and in their attempts to recall what was not encoded, they are vulnerable to imprecision. This phenomenon is present in most of the survivors I have treated and is pronounced among those who experience dissociation or traumatic brain injury, which Mr. Angye has experienced through torture. The phenomenon is also well documented in the scientific literature (Ashbaugh, Marinos, & Bujaki, 2018; Zepinic, 2018).

### Authenticity of Account

Mr. Angye's psychological symptoms, nonverbal presentation, and accounts of emotional functioning and trauma history show several characteristics of authenticity. First, his reported and visible symptoms were within the expected range for someone who has survived the kinds of trauma events he reported. Other characteristics that support the authenticity of his account include: Mr. Angye's report was congruent throughout our extended interview, and his

Humanitarian Outreach for Migrant Emotional Health (H.O.M.E.)

Homemigration.org

open-ended responses were congruent with the results of standardized symptom checklists I administered. I repeated questions with different wording and at different points in the session, yet his responses remained the same. The length of time I spent with Mr. Angye was substantial, totaling approximately 150 minutes. Mr. Angye did not over-affirm symptoms presented on the checklists, and there was no indication he was trying to present in any particular way. He was able to provide a high number of specific information, including names, dates, and sensory information. Mr. Angye's reported symptoms were clearly observable through his anxious and depressed affect, and his emotional overwhelm when remembering traumatic events, especially the graphic details.

## Prognosis and Recommendations

Recovery from PTSD requires survivors to develop a sense of safety. Mr. Angye's fears regarding his potential return to his country of origin is a significant barrier to his recovery. Additionally, Mr. Angye needs to maintain access to appropriate mental health care as he recovers from his trauma experiences and is stabilized for his mental health. He reported he is unlikely to receive adequate care in Cameroon. Continued detention is contra-indicated for Mr. Angye due to his diagnosis of PTSD and major depressive disorder. He is constantly reminded of his traumatic experiences in detention, he is not receiving basic needs including sufficient water, hygiene, and appropriate food on a regular basis. Release to a safe environment would facilitate his recovery through reducing triggers for PTSD, access to comprehensive psychological treatment, and increasing his sense of security and stability.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Meghan Colpas, Psy.D., Licensed Clinical Psychologist, NM

PSY-2025-0016

megcolpas@gmail.com

Exhibit

"C"

*Gerald ANGYE*
*A# 22 1149 069*



**H U M A N
R I G H T S
W A T C H**

**JULY 18, 2024**

# <u>Deported Cameroonian Asylum Seekers Returned to US</u>

Returnees Abused in Both Countries; US Breached Asylum Confidentiality
Published in

(Washington, DC) – The <u>United States</u> government has, since May 2024, approved the return of 27 Cameroonian asylum seekers who <u>experienced serious harm</u> in <u>Cameroon</u> after their deportation from the US in 2020, a coalition of human rights groups said today. While the returns were permitted on humanitarian grounds, in part based on US asylum confidentiality violations that contributed to their harm in Cameroon, the asylum seekers had also experienced <u>abuses in US immigration detention</u>, including the use of excessive force, painful full-body restraints, solitary confinement, racial discrimination, and medical neglect.



Daniel T., coordinator of the Cameroon Advocacy Network, an immigrant rights coalition, holds a sign calling for a halt to US deportations to Cameroon and for Temporary Protected Status (TPS) for Cameroonians in the US, due to widespread safety risks in Cameroon.

© 2021 CASA

In October and November 2020, amid <u>reports</u> of the <u>mistreatment</u> of Cameroonian asylum seekers in US Immigration and Customs Enforcement (ICE) custody, the administration of then-US President Donald Trump deported dozens back to Cameroon, despite the ongoing risks of danger there and the objections of <u>advocates</u> and <u>members of Congress</u>. Prior to the Cameroonians' deportations, ICE officials prevented many from accessing their luggage, which held sensitive asylum documents, leading to their discovery by Cameroonian authorities.

A <u>2022 Human Rights Watch report</u> documented that deported Cameroonians experienced abuses by Cameroonian authorities, including rape, torture, and other physical abuse, arbitrary detention, extortion, unfair prosecutions, restrictions on freedom of movement, and the targeting of relatives.

The US Department of Homeland Security granted the 27 Cameroonians humanitarian parole, a mechanism that allows people to enter the US temporarily on humanitarian grounds. Their applications -- submitted on their behalf by immigrant rights and legal groups -- note that in denying them the ability to remove the documents from their bags, ICE officials violated US federal regulation 8 C.F.R. § 208.6 on asylum confidentiality. They are now permitted to remain in the US for one year. During this time, they may reapply for asylum.

"When I fled my country and made my way to the US border, I thought that America would be a safe haven," said one of the returned Cameroonian asylum seekers. "But with all the suffering I went through during immigration detention and deportation, I felt betrayed and shocked. Sending us back to Cameroon with our documents exposed was like putting a target on our backs. Now, for the US to finally right this wrong means there's still hope. I can dream again."

Cameroon has faced conflict and violence in several of its regions in recent years, leading to humanitarian crises. Respect for human rights has deteriorated, and the government has increasingly cracked down on opposition and dissent. Violence since late 2016 by government forces and armed separatist groups in Cameroon's two Anglophone regions has caused mass displacement, as have intercommunal violence and ongoing conflict with Boko Haram in the Far North region.

In fiscal year 2020, though conditions in Cameroon had not improved, US immigration courts granted asylum or other protection to 24 percent fewer Cameroonians than in 2019, a much larger decrease than the decline for asylum seekers overall. Human Rights Watch documented that due process concerns, fact-finding inaccuracies, and other issues contributed to unfair asylum denials to many of the Cameroonians deported in 2020, despite their credible claims.

Meanwhile, Cameroonians in ICE detention faced mistreatment that stood out even among all the anti-immigrant actions of the Trump administration. In August 2020, Cameroonians in Louisiana waged a hunger strike to protest their prolonged ICE detention. Guards responded by dousing them with pepper spray, beating them, and putting them in solitary confinement.

Deportations of Cameroonians surged in late 2020 ahead of the change in US presidential administrations. By returning them to face harm, the Trump administration violated the principle of nonrefoulement, the cornerstone of international refugee law, and it compounded the violation by breaching their confidentiality.

"The 27 Cameroonian asylum seekers who have returned to the US suffered unimaginable abuse at the hands of both US and Cameroonian authorities," said Daniel Tse, founder of the Cameroon Advocacy Network. "The US government took a positive step by approving their returns, but it should not have taken four years to remedy its error. This is no arbitrary reversal of deportations -- humanitarian parole is a legal return process under US immigration law, used to help those in danger. Though the returns underscore US

commitment to human rights, these Cameroonians' experiences highlight the urgent need for reforms within the US immigration system and the ongoing need to protect Cameroonians from deportation."

The 27 people granted humanitarian parole are a small fraction of the Cameroonians in need of protection, according to advocates. In 2022, the Biden administration designated Cameroon for Temporary Protected Status (TPS), which protects Cameroonians in the US from deportation for 18 months; this was later extended until June 2025. However, backlogs in processing applications have prevented thousands of Cameroonians from accessing the protection. The US government should increase resources devoted to addressing application backlogs and continue to redesignate Cameroon for TPS, given the ongoing risks.

The groups supporting the returned Cameroonians are Robert F. Kennedy Human Rights, Haitian Bridge Alliance, Human Rights Watch, Cameroon Advocacy Network, Witness at the Border, the Center for Constitutional Rights, and the Texas A&M School of Law Legal Clinics.

# Related Content

America's Definition of 'Refugee' Needs an Update US: Deported Cameroonian Asylum Seekers Suffer Serious Harm
Region / Country

- Cameroon
- United States
- Immigrants' Rights and Border Policy

Topic

- Refugees and Migrants

---

**Source URL:** *https://www.hrw.org/news/2024/07/18/deported-cameroonian-asylum-seekers-returned-us*

Exhibi



"D"

14-2B

# SEXUAL ABUSE SCREENING TOOL

| Facility | TCOF | | Date | 11/30/25 |
| --- | --- | --- | --- | --- |
| Inmate/Detainee Name | Angye Gerald | | ID Number | 221199009 |
| | | | Date of Arrival | 03/26/25 |

## INMATE/DETAINEE INTERVIEW AND FILE REVIEW

CHECK ONE: ☐ Initial  ☒ 30-Day Reassessment *(60-90 day)*  ☐ New Information  ☐ Incident of Abuse

### SECTION I: VICTIMIZATION HISTORY/RISK

| Inmate/Detainee Questions | Response |
| --- | --- |
| 1. Have you been the victim of sexual assault, sexual abuse, or unwelcome sexual activity while incarcerated? | ☐ YES ☒ NO |
| ANSWERING YES TO THE ABOVE QUESTION REQUIRES AN OFFER OF MENTAL HEALTH FOLLOW-UP FORM 14-2L | |
| Comments: | |
| 2. Have you been the victim of sexual assault, or sexual abuse while in the community? | ☐ YES ☒ NO |
| ANSWERING YES TO THE ABOVE QUESTION REQUIRES AN OFFER OF MENTAL HEALTH FOLLOW-UP FORM 14-2L | |
| Comments: | |
| 3. Have you ever been threatened with sexual assault by another inmate/detainee while incarcerated? | ☐ YES ☒ NO |
| Comments: | |
| 4. Do you feel that you are vulnerable to sexual abuse or assault while incarcerated? | ☐ YES ☒ NO |
| Comments: | |
| 5. Is your sexual orientation lesbian, gay, or bisexual? | ☐ YES ☒ NO |
| Comments: | |
| 6. Do you identify as transgender, gender non-conforming, or intersex? | ☐ YES ☒ NO |
| Comments: | |
| 7. Do you believe that others perceive you as gay, lesbian, bisexual, transgender, intersex, or gender non-conforming? | ☐ YES ☒ NO |
| Comments: | |

| Staff Observation / File Review | Response |
| --- | --- |
| 8. Inmate/detainee has a physical, developmental, or mental disability | ☐ YES ☒ NO |
| Comments: | |
| 9. The inmate/detainee is less than 24 years old or over the age of 60 | ☐ YES ☒ NO |
| Comments: | |
| 10. The inmate/detainee has a small build (males under 5'5" and/or less than 150 lbs.; females under 5'0" and/or less than 115 lbs.) | ☐ YES ☒ NO |
| Comments: | |
| 11. This is the first time the inmate/detainee has been incarcerated | ☒ YES ☐ NO |
| Comments: | |
| 12. The inmate/detainee has only a non-violent criminal history | ☐ YES ☒ NO |
| Comments: Has never been to jail | |
| 13. The inmate/detainee has prior convictions for a sex offense against an adult or child | ☐ YES ☒ NO |
| Comments: | |
| 14. The inmate/detainee is being detained solely for civil immigration purposes | ☒ YES ☐ NO |
| Comments: | |

After interviewing the inmate/detainee and recording observations and findings from the file review, indicate the following:

☐ Victim – Check here if inmate/detainee answered YES to questions 1-2 or 6.

☐ Potential Victim – Check here if answering YES to three or more of remaining questions 3, 4, 5 and 7-14.

☒ Not Applicable – Check here if inmate/detainee has no known victimization history/risk.

 Proprietary Information – Not for Distribution – Copyrighted – Property of CoreCivic  05/09/2025

14-2B

# SEXUAL ABUSE SCREENING TOOL

## SECTION II: PREDATORY HISTORY/RISK

| Inmate/Detainee File Review | Response |
|---|---|
| 15. Previous conviction for sexual assault or sexual abuse while incarcerated in a prison or jail? | ☐ YES  ☑ NO |
| ANSWERING YES TO THE ABOVE QUESTION REQUIRES AN OFFER OF MENTAL HEALTH FOLLOW-UP FORM 14-2L | |
| Comments: | |
| 16. Previous disciplinary sanction for sexual assault or sexual abuse while incarcerated in a prison or jail? | ☐ YES  ☑ NO |
| ANSWERING YES TO THE ABOVE QUESTION REQUIRES AN OFFER OF MENTAL HEALTH FOLLOW-UP FORM 14-2L | |
| Comments: | |
| 17. Current or prior conviction in the community for a **sex offense**? | ☐ YES  ☑ NO |
| ANSWERING YES TO THE ABOVE QUESTION REQUIRES AN OFFER OF MENTAL HEALTH FOLLOW-UP FORM 14-2L | |
| Comments: | |
| 18. Current or prior conviction of a **violent offense**? | ☐ YES  ☑ NO |
| Comments: | |
| 19. Disciplinary sanction for violence while incarcerated in a prison or jail? | ☐ YES  ☑ NO |
| Comments: | |
| 20. Inmate/detainee has a security threat group affiliation | ☐ YES  ☑ NO |
| Comments: | |

After interviewing the inmate/detainee and recording observations and findings from the file review, indicate the following:

☐ **Predator – Check here if inmate/detainee answers YES to either question 15 or 16 above.**

☐ **Potential Predator – Check here if answering YES to 17 or two or more of remaining questions 18-20 above.**

☑ **Not Applicable – Check here if inmate/detainee has no known predatory history/risk.**

## SECTION III: DISCREPANCIES BETWEEN THE INTERVIEW AND THE FILE REVIEW

| 21. Are there discrepancies between the interview and the file review? | ☐ YES  ☑ NO |
|---|---|
| Describe: | |
| *Discrepancies must be accurately reflected in the answers to the questions in each section of this form. | |
| Screener's Printed Name  Angela | Title  DO |
| Screener's Signature | Date  11/26/25 |

Forward a copy of each completed form to classification/unit staff for housing, bed, work, education, and program assignments, and to the Health Services Department for further evaluation and screening.

cc:  Classification/Unit Staff; Health Services Department

Exhibit

"E"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS


Gerald Angye Phari,
_____
(Plaintiff)

Case No. A# 22199069
_____

vs

Declos George, Warden TCDF
_____
(Defendant)

MOTION TO PROCEED IN FORMA PAUPERIS

I, plaintiff, _Gerald      Angye      Phari_____,

respectfully moves this Honorable Court for leave to proceed in this matter without payment of

fees, costs, or security.

Attached hereto is an affidavit in support of my motion to proceed in forma pauperis.


Respectfully submitted,

Plaintiff _Gerald     Angye     Phari_____

Address _Torrance County Detention Facility,_

_209 County Road A049,_

_Estancia, NM  87016._

Phone _____N/A_____

Date 01-12-2026

## AFFIDAVIT IN SUPPORT OF MOTION FOR LEAVE TO PROCEED IN FORMA PAUPERIS

INSTRUCTIONS: Complete all questions in this affidavit and then sign it. Do not leave any blanks. If the answer to a question is "0", "none", or "not applicable (NA)", write in that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.

1.    Are you presently employed? YES _____ NO ✓

    (a) If the answer is "YES", state the amount of your gross salary or wages per month and give the name and address of your employer.

    $ _N/A 0_ per month

    Employer _____ N/A _____

    (b) If the answer is "NO", state the date of last employment and the amount of the gross salary and wages per month which you received.

    $ _0_ per month

    Employer _____ N/A _____

2.    Is your spouse presently employed? YES _____ NO ✓

    If the answer is "YES", state the gross amount of his/her salary or wages per month and give the name and address of his/her employer.

    $ _0_ per month

    Employer _____ N/A _____

2

3. Have you or your spouse received within the past twelve (12) months any money from any of the following sources:

(a) Business, profession, or form of self-employment?  YES _____  NO _✓_

(b) Rent payment, interest or dividends?  YES _____  NO _✓_

(c) Pensions, annuities, or life insurance payment?  YES _____ NO _✓_

(d) Gifts or inheritances?  YES _____  NO _✓_

(e) Any other sources?  YES _____     NO _✓_

If the answer to any of the above questions is "YES", describe each source of money and state the amount received from each during the last twelve (12) months and by whom.

_____ N/A _____

_____

_____

4. How much cash do you and your spouse have? $_____ 0 _____.

5. List any money you or your spouse have in bank accounts or in any other financial institution and the name of the financial institution.

_____ N/A _____

_____

_____

6. List the assets and the values which you or your spouse own.  Do not list clothing and ordinary household furnishings.

Home Address _____ N/A _____

Value of Home _____ N/A _____

Motor Vehicle #1 Make, Year, Model _____ N/A _____

Value of Motor Vehicle #1 _____ N/A _____

3

Motor Vehicle #2 Make, Year, Model _____ N/A _____

Value of Motor Vehicle #2 _____ N/A _____

7.  Do you or your spouse own any other real estate, stocks, bonds, notes, automobiles, or other valuable property not listed above (excluding ordinary household furnishings and clothing)?
YES _____    NO ✓___

If the answer is "YES", describe the property and state its approximate value.

_____ N/A _____

_____

8.  List the persons who are dependent upon you or your spouse for support, state your relationship to those persons, and indicate how much you contribute toward their support.

_____ N/A _____

_____

9.  Do you expect any major changes to your spouse's monthly income or expenses or in your or your spouse's assets or liabilities during the next 12 months?
YES _____    NO ✓___

If yes, describe below or on an attached sheet.

_____ N/A _____

_____

10. Estimate the average monthly expenses of you and your family.  If different, list separately the amounts paid by your spouse.

Rent or home-mortgage payment _____ N/A _____

Utilities (electricity, heating fuel, water, sewer, and phone) _____ N/A _____

Home maintenance (repairs and upkeep) _____ N/A _____

Food _____ N/A _____

4

Clothing _____ N/A _____

Laundry and dry-cleaning _____ N/A _____

Medical and dental expenses _____ N/A _____

Transportation (not including motor vehicle payments) __ N/A _____

Recreation, entertainment, newspapers, magazines, etc. _____ N/A _____

Insurance (not deducted from wages or include in mortgage payments)

    Homeowner's or renter's insurance _____ N/A _____

    Life insurance _____ N/A _____

    Health insurance _____ N/A _____

    Motor vehicle insurance _____ N/A _____

    Other insurance _____ N/A _____

Taxes (not deducted from wages or included in mortgage payments) ___ N/A _____

Installment payments

    Motor vehicle _____ N/A _____

    Credit card _____ N/A _____

    Department store credit card _____ N/A _____

    Other installment payments _____ N/A _____

Alimony, maintenance and support paid to others ___ N/A _____

Regular expenses for operation of business, profession, or farm (attach a detailed

    statement) _____ N/A _____

Other expenses _____ N/A _____

11.   Provide any other information that will help explain why you cannot pay the filing fees for your case.

I am a Reefugee and Asylum Seeker been held in ICE detaintion not employ. I donot earn income please accept.

I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the filing fees of my case.  I believe that I am entitled to redress.  I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct.
(28 U.S.C. 1746, 18 U.S.C. 1621)

01 - 12 - 2026
_____
Date

_____
Signature of Applicant

6